RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
ELECTRONIC CITATION: 2001 FED App. 0190P (6th Cir.)
File Name: 01a0190p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

LOIS CHRISTIAN; AMBER
EDENS,
   *Plaintiffs-Appellants,*

     *v.*

WAL-MART STORES, INC.,
   *Defendant-Appellee.*

No. 99-3926

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 98-00922—Patricia A. Gaughan, District Judge.

Argued: March 7, 2001

Decided and Filed: June 6, 2001

Before: MARTIN, Chief Judge; MOORE, Circuit Judge;
TARNOW, District Judge.[*]

_____

[*] The Honorable Arthur J. Tarnow, United States District Judge for
the Eastern District of Michigan, sitting by designation.

1

---

**COUNSEL**

**ARGUED:** John W. Mygrant, MENTZER, VUILLEMIN & MYGRANT, Akron, Ohio, for Appellants.  Clifford C. Masch, REMINGER & REMINGER, Cleveland, Ohio, for Appellee.  **ON BRIEF:**  John W. Mygrant, Valarie J.R. Young, MENTZER, VUILLEMIN & MYGRANT, Akron, Ohio, for Appellants.  Clifford C. Masch, REMINGER & REMINGER, Cleveland, Ohio, for Appellee.

---

**OPINION**

---

KAREN NELSON MOORE, Circuit Judge.  Plaintiffs-Appellants Lois Christian and Amber Edens appeal the district court's grant of judgment as a matter of law on their federal and state claims of race discrimination in a retail establishment.  Christian, who is black, and Edens, who is white, went to a Wal-Mart on December 15, 1997 to buy Christmas presents.  A Wal-Mart employee offered Christian repeated assistance, which Christian declined.  Edens was offered no assistance.  The employee, claiming that Christian was shoplifting, then called the police.  Thereafter, Christian and Edens were escorted out of the store by police officers and were not allowed to complete their purchases.  Christian and Edens brought this action under 42 U.S.C. § 1981, 42 U.S.C. § 2000a, and Ohio Revised Code § 4112.02(G), alleging, inter alia, that they were refused their right to make a contract with Wal-Mart because of Christian's race.  Because we believe the district court erred by granting Wal-Mart judgment as a matter of law, we conclude that we must **REVERSE** the district court's judgment.

## I. BACKGROUND

On December 15, 1997, at approximately 1:45 a.m., Christian and Edens, who are close friends, entered a Wal-

Mart in Jackson Township, Ohio to shop for Christmas presents for their respective children. Both women stayed within the toy department but they shopped separately. They were the only two shoppers in the toy department. Christian walked around with a shopping cart; Edens occasionally placed items in Christian's cart but she did not have her own cart. According to Christian, Rose Monnot, a Wal-Mart employee, watched her as she shopped and repeatedly offered her assistance. Christian stated that she was initially offered help two or three times, although she later stated that she was offered help a total of six times throughout the hour and three quarters during which she shopped.[1] J.A. at 119, 144. Edens testified that within the first 20 minutes after their arrival at the store, Christian informed her that she had been offered help a couple of times. Edens stated that once Monnot saw that she was with Christian, Monnot started to follow her as well.[2] Edens, however, was never offered assistance.

Sometime close to 3:00 a.m., Christian put her purse on a shelf, unzipped it, and reached into her purse for a jar of vasoline. J.A. at 119. At that moment, Christian noticed Monnot "jogging down" the aisle toward her. Monnot, upon reaching Christian, again asked if she could be of assistance, but Christian declined her help. Christian then reported the incident to Edens.

Monnot testified to a very different set of events. According to Monnot, she heard Christian unzip her purse from where she was standing six aisles away.[3] She says that she saw Christian reach with her left hand, pick up a toy, and

---

[1]Monnot claims that she offered Christian assistance twice. J.A. at 149.

[2]It is not clear from Eden's testimony when Monnot first saw the two women together.

[3]We relate Monnot's version of the story although, for purposes of the standard of review in this case, we may ultimately credit only the nonmovant's version of any disputed facts.

place the toy in her purse which was hanging over her left shoulder. Monnot then saw Christian place her bag on a shelf and zip it. Monnot stated that she recognized which item had been taken because she had been stocking that particular toy earlier that night.

Monnot testified that she then paged the manager, Richard Clark, and informed him that a woman had placed an item in her purse. Clark told Monnot to call the police; Monnot then instructed a cashier to call the police. Clark also directed Monnot to keep an eye on the woman. Monnot and the cashier then returned to the toy department so that Monnot could point out Christian to the cashier. Christian testified that she then approached Monnot and the cashier and told Monnot, "Excuse me, ma'am. Do you believe I'm stealing? Because I'm not. I went into my purse for something for me." J.A. at 120. Monnot denied that she suspected her of shoplifting. According to Edens, she then stated to Monnot: "[Christian] has been feeling uncomfortable and we're ready to leave. And we have a right to shop here, and we would like to just finish our Christmas shopping." J.A. at 207. Edens testified that Monnot replied, "Oh, no, at this time of year I not only watch for shoplifters, you know, people lingering around the store and have knives and gun[s] on them." J.A. at 207.

At some point, either before or after Christian and Edens spoke with Monnot, Christian heard an announcement over the store intercom calling "employees to the toy department," and when she looked up she found six or seven employees staring at her. J.A. at 121.

Monnot testified that when she later returned to the aisle, she realized that the item she believed had been stolen had been returned. Monnot then called the cashier and told her to tell the police not to come to the store because the item had been returned. Shortly thereafter, at approximately 3:33 a.m., the police arrived. Monnot then told the police that the item had been returned and she was sorry they had been called to the store for no reason. Police Officer Todd Macaluso

reasonable jury could have believed that Monnot's (and, by implication, Clark's) stated reason for interfering with Christian's right to contract had no basis in fact. Based on this disbelief, we believe that a reasonable jury, confronted with the facts before us, could infer the ultimate fact of discrimination from the falsity of Monnot's explanation combined with the evidence supporting the plaintiffs' prima facie case. At this point, plaintiffs have surmounted every evidentiary hurdle before them: their case must be submitted to the jury for final resolution. Therefore, we **REVERSE** the district court's grant of judgment as a matter of law to Wal-Mart on plaintiffs' § 1981 claim.

**D. Christian's State Law Claim**

Christian's state law claim rises and falls with her federal claim because we evaluate Ohio state law discrimination claims generally under the same standard as federal discrimination claims. *See Jackson v. City of Columbus,* 194 F.3d 737, 756 (6th Cir. 1999). Therefore, we must **REVERSE** the district court's grant of judgment as a matter of law on Christian's state law claim because we have reversed the district court with respect to Christian's federal claim.

**E. Edens's Claims**

Because Edens's claims of discrimination are premised on a finding of discrimination against Christian, we must **REVERSE** the district court's grant of judgment as a matter of law on Edens's federal and state law claims since we have reversed the district court with respect to Christian's claims.

### III.  CONCLUSION

For the foregoing reasons, we **REVERSE** the district court's grant of judgment as a matter of law and **REMAND** for a new trial.

back to the plaintiff, who must prove by a preponderance that the defendant's stated reason was not its true reason, but was a pretext for discrimination. *Reeves*, 530 U.S. at 142-43. The plaintiff may attempt to prove that she was the victim of intentional discrimination "by showing that 1) the stated reasons had no basis in fact; 2) the stated reasons were not the actual reasons; and 3) that the stated reasons were insufficient to explain the defendant's action." *Johnson*, 215 F.3d at 573. In reaching the ultimate conclusion that the defendant intentionally discriminated, "it is *permissible* for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation." *Reeves*, 530 U.S. at 147. Specifically, as the Court explained in *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511 (1993), "[t]he factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination." This is so because "once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision." *Reeves,* 530 U.S. at 147.

At trial, a jury would weigh Christian's credibility versus Monnot's and choose to believe one witness's testimony over the other. We are not permitted to engage in such a weighing process. As we have already explained, we must presume on review of a judgment as a matter of law that Christian did not shoplift and that Monnot's version of the events is untrue. If Christian did not shoplift, then Christian easily raised a jury issue as to whether Monnot fabricated the incident and then reported it to her supervisor, knowing that her supervisor would then order her to call the police and ultimately have the women removed from the store.[10]  In other words, a

---

[10]Of course, this inference would be weighed against the inference created by Christian's testimony that, although she did not attempt to steal anything, the act of unzipping her purse could have been caused Monnot to believe she was stealing.

testified that Monnot explained that she did not see a customer place an item in her purse, just that an item was missing. J.A. at 178. According to Monnot, the police asked her if she wanted to have the woman whom she had suspected of shoplifting removed from the store and then asked her to describe the two women. Monnot stated that she did not have the authority to decide whether the women should be removed. At that point, Monnot testified that she informed the police that one woman was white and the other was black. She testified that this was the first time she had mentioned either shopper's race to anyone.

Clark, the store manager, then approached the police officers. According to Officer Macaluso, he then asked Clark what the officers should do, if anything. Clark appeared "indecisive" but ultimately decided that the officers should ask the two women to leave. Monnot testified that she never told Clark the race of either of the two women. Macaluso also testified that he never discussed the women's race with Clark. Macaluso testified that he did not know Christian or Eden's race until Monnot walked him to the toy department. Clark testified that he never saw the two women, nor was he ever informed of their race.

Monnot directed the police officers to Christian and Edens. Monnot admitted to telling the officers that if they removed Christian, they should also remove Edens so that it would not become a racial issue. J.A. at 151. Monnot then went on a break. According to Christian, the officers then approached her and Edens and asked them to leave the store. Christian testified that the officers stated, "They do not like your business. They would like you to leave." J.A. at 123. The officers did not accuse Christian of shoplifting or search her bag. The officers then escorted Christian and Edens out of the store. Christian was forced to leave behind her shopping cart of merchandise.

As a result of this incident, plaintiffs brought suit against Wal-Mart in federal district court alleging claims under 42 U.S.C. § 1981, 42 U.S.C. § 2000a, and Ohio Revised Code

§ 4112.02(G) as well as a claim for intentional infliction of emotional distress. Wal-Mart subsequently moved for summary judgment. The district court granted Wal-Mart's motion as to the 42 U.S.C. § 2000a claim and the intentional infliction of emotional distress claim. The district court also granted summary judgment as to Edens's claims. Edens then moved to have the first and third counts reinstated as to her, which the district court granted.

At trial, Christian attempted to prove that Wal-Mart had a policy for dealing with shoplifters which Monnot and Clark failed to follow. Clark testified that an employee who sees a shopper place a piece of merchandise on his person is supposed to keep the shopper in view until the shopper leaves the last point of purchase. At that point, Clark testified that the employee could stop the shopper and keep him in the store until the police arrived. Clark stated that if the employee lost sight of the shopper for even a moment, the employee was not permitted to stop the shopper. Monnot testified that she believed it was store policy to notify management if she suspected a shopper of shoplifting. She also stated that she was never given any specialized training with regard to how to deal with shoplifting.

Wal-Mart focused on the issue of its intent to discriminate. On cross-examination, Wal-Mart's attorney repeatedly questioned Christian about the moment at which she unzipped her purse, ultimately eliciting from her an admission that Monnot could have believed that someone was stealing when Monnot heard the sound of a purse being unzipped. Instead of contesting Monnot's suspicions as racially motivated, Christian conceded that her actions could have given rise to Monnot's perception that she had concealed, or was attempting to conceal, store merchandise. J.A. at 141-42. She also admitted that it is reasonable for a salesperson who suspects someone is stealing to approach that person. J.A. at 142.

At the end of the plaintiffs' case, Wal-Mart moved for judgment as a matter of law. Based on Christian's testimony

both women arrived together and were the only two shoppers in the toy department. The one who was selecting merchandise and placing it into a shopping cart, Christian, was inordinately offered assistance, while the other, who had no shopping cart, was left undisturbed. The only factual difference between these two shoppers, i.e., that Christian had a shopping cart, reinforces the inference of discrimination, because a customer with a cart presumably appears more serious about shopping than a patron who walks around without a cart. The evidence shows that Christian raised a genuine issue of fact as to whether she received services in a markedly hostile manner and in a manner which a reasonable person would have found objectively discriminatory. Again, for purposes of this appeal, we must conclude that Monnot reported a shoplifting incident which did not occur, the result of which was that Christian was forced to leave the store and forfeit her right to complete her purchase. Viewed in this light, Christian raised a material issue of fact as to whether Monnot's behavior may be characterized as hostile and objectively discriminatory in that it was profoundly contrary to the manifest financial interests of Wal-Mart and far outside of widely-accepted business norms.

Once we have determined that plaintiffs have produced evidence to establish their prima facie case, we must then consider the second phase of the burden-shifting framework, namely whether Wal-Mart articulated a legitimate, non-discriminatory reason for its actions. Wal-Mart asserts that its legitimate reason was that Christian was suspected of attempted shoplifting. Clark, the ultimate decisionmaker, testified that he wanted the women removed from the store but denied that his decision was influenced by race. J.A. at 190. Because Wal-Mart's burden is one of production, not of persuasion, we must accept Wal-Mart's stated reason that it had both plaintiffs expelled from the store because of suspicion that Christian had attempted to shoplift.

After the defendant produces evidence of its non-discriminatory reason for its action, the presumption of discrimination falls away and the production burden shifts

As to the question of a "nexus" or causality, the evidence put forward by Wal-Mart is that Clark never knew either shopper's race; this is so because he did not conduct his own independent investigation into the alleged shoplifting incident but instead, as Wal-Mart vigorously argues, relied exclusively on Monnot's version of the events when making his decision. Indeed, Wal-Mart averred in its brief that "Mr. Clark's decision to ask the police to remove the appellant from the store was based solely on suspicious [sic] arising from the 'zipper' incident." Appellee's Br. at 16. We agree with the district court's findings that Clark based his actions exclusively on Monnot's allegations, and on none of his own perceptions. This case is, therefore, completely unlike *Wilson*, in which the decisionmaker conducted an independent investigation into the conduct forming the basis for the plaintiff's discharge and credited that investigation in his decision to fire the plaintiff. On the contrary, this case is more like *Shager*, in which plaintiff presented evidence showing that the committee's decision to fire plaintiff was tainted by the supervisor's prejudice. In this case, like *Shager*, there is evidence that the decisionmaker "acted as the conduit of the [employee's] prejudice — [her] cat's paw" — and that the employee's "influence may well have been decisive." *Shager*, 913 F.2d at 405. We stated in *Wilson* that "[t]he determinative question is whether Wilson has submitted evidence that [the supervisor's] racial animus was a cause of the termination." *Wilson*, 952 F.2d at 946. Based on the evidence, we must conclude that Monnot's report of the zipper incident not only influenced Clark, it was the exclusive and decisive factor in his decisionmaking. We therefore conclude that Christian presented sufficient evidence for a jury to find that Monnot's racial animus may be imputed to Clark.

In light of this determination, we are persuaded that Christian provided sufficient evidence to create an inference of discrimination to support a prima facie case. Some of the evidence adduced at trial demonstrates that Christian was treated differently from a shopper similarly situated in all relevant respects, namely Edens. The testimony revealed that

on cross-examination and Monnot's testimony that she had tried to tell the police to leave when she realized that the allegedly stolen item had been returned, the district court determined that Christian had failed to establish that Monnot had the requisite intent to discriminate. J.A. at 246-47. Moreover, the district court stated that because Clark made the decision to ask plaintiffs to leave the store, and the evidence was uncontroverted that Clark never knew either woman's race, there was no evidence to demonstrate that Clark's actions were motivated by racial animus. J.A. at 248. Because the district court found there was no racial discrimination against Christian, the court determined that Edens was not asked to leave based on her association with an African-American. Therefore, the district court granted Wal-Mart's motion as to both plaintiffs. The plaintiffs timely appealed the district court's order.

## II. ANALYSIS

### A. Standard of Review

We review the district court's grant of judgment as a matter of law under Fed. R. Civ. P. 50(a) de novo. We consider all the evidence in the record, including those facts that are in dispute, in the light most favorable to the nonmoving party, giving her the benefit of all reasonable inferences. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Jackson v. Quanex Corp.*, 191 F.3d 647, 657 (6th Cir. 1999). Thus, "although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves*, 530 U.S. at 151. We may not, however, make credibility determinations or weigh the evidence. *Id.*

Federal Rule of Civil Procedure 50(a)(1) states that judgment as a matter of law is appropriate only where "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." FED. R. CIV. P. 50(a)(1). In other words, a district court may "take the case away from the jury . . . whenever there is a complete absence of pleading or proof

on an issue material to the cause of action or when no disputed issues of fact exist such that reasonable minds would not differ." *Jackson*, 191 F.3d at 657 (internal quotation omitted). A dismissal pursuant to Rule 50(a) is, however, "improper where the nonmovant presented sufficient evidence to raise a material issue of fact for the jury." *Id.*

## B.  § 1981 Prima Facie Case

Section 1981 prohibits intentional race discrimination in the making and enforcing of contracts with both public and private actors. 42 U.S.C. § 1981. The statute's protection extends to "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." *Id.* § 1981(b). This circuit has held that to prevail in a claim of race discrimination under § 1981 relying on circumstantial evidence, a plaintiff must meet the burden-shifting standard of proof for Title VII cases established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981). *Jackson*, 191 F.3d at 658; *Harvis v. Roadway Express, Inc.*, 923 F.2d 59, 61 (6th Cir. 1991). Under this standard, a plaintiff must first establish a prima facie case of discrimination by a preponderance of the evidence. The burden of production then shifts to the defendant to articulate a legitimate, non-discriminatory reason for its actions. To prevail, the plaintiff must then prove by a preponderance of the evidence that the defendant's proffered reason is not its true reason but a pretext for discrimination. *See Reeves*, 530 U.S. at 142-43 (applying three-part test in jury trial); *Burdine*, 450 U.S. at 253 (applying three-part test in bench trial).

While § 1981 is generally invoked in the employment context for, e.g., claims of hostile environment, failure to promote, or wrongful dismissal, litigants have also brought suit under the statute for claims of discrimination in retail and service settings. We have never established a test for a prima facie case of discrimination under § 1981 outside of the

was fired because of his age in violation of the Age Discrimination in Employment Act. The court first concluded that Shager had adduced evidence sufficient to survive summary judgment that Shager's supervisor intended to discriminate against Shager because of his age. The court then confronted the problem posed by the fact that Shager was fired, not by the supervisor, but by a hiring committee which was unaware of Shager's age when it decided to fire him. According to the Seventh Circuit, if the committee "acted as the conduit of [the manager's] prejudice — his cat's paw — the innocence of its members would not spare the company from liability." *Shager*, 913 F.2d at 405. Of course, if the committee "was not a mere rubber stamp, but made an independent decision to fire Shager," the court noted that there would be no basis for finding that the employer violated the Act. *Id.* at 406. Finding that the supervisor "set up Shager to fail" in his job duties and then portrayed Shager's performance "in the worst possible light" to the committee, the court concluded that the committee's decision to fire Shager "was tainted by [the supervisor's] prejudice" and that the supervisor's "influence may well have been decisive." *Id.* at 405. Based on this determination, the Seventh Circuit concluded that the fact that the committee was ignorant of Shager's age did not insulate the employer from liability for the supervisor's discrimination at the summary judgment stage, and that the question of the causal link between Shager and the committee's termination decision must be submitted to a jury.

We are persuaded by these cases that Clark's apparent ignorance of the plaintiffs' race does not shield Wal-Mart from liability and that if plaintiffs have offered sufficient evidence to show a causal nexus between Monnot's prejudice and Clark's decisionmaking, then plaintiffs' case may proceed. In this case, Clark was clearly the decisionmaker for Wal-Mart. He unequivocally testified that he was the senior manager at Wal-Mart in the early morning of December 15, 1997, J.A. at 191, and we know that he made the ultimate decision to have the plaintiffs escorted out of the store.

are not convinced that this question of fact is dispositive of the question of Wal-Mart's liability. For guidance, we turn to case law from other civil rights actions. We believe that the most analogous cases are those in the employment context in which an employee challenges his termination as improperly motivated by a supervisor's discriminatory animus and then seeks to impute that animus to the neutral decisionmaker who ultimately terminated the employee. In this circuit, we have held that, to complete a prima facie case under such circumstances, the plaintiff must offer evidence that the supervisor's racial animus was the cause of the termination or somehow influenced the ultimate decisionmaker. *See Wilson v. Stroh Cos.*, 952 F.2d 942, 946 (6th Cir. 1992).

In *Wilson*, the plaintiff, a black factory employee, brought a Title VII claim alleging that his supervisor's racial animus led to his improper termination from his job at Stroh's. For purposes of the appeal, a panel of this court assumed the fact of the supervisor's discriminatory animus but noted that, even though the supervisor alerted Stroh's management to the conduct for which Wilson was ultimately fired, Wilson could not rebut Stroh's showing that he was fired by Stroh's general manager upon the recommendation of the industrial relations manager, who had conducted an independent investigation into the conduct forming the basis of Wilson's discharge. According to the panel, the fact of the independent investigation, coupled with the lack of evidence that the supervisor failed to report similar conduct by white employees, and the lack of evidence that management had relied on a false record created by the supervisor, was dispositive of the case. Ultimately, we held that the plaintiff could not make out a prima facie case of discrimination because he could not demonstrate any "causal nexus" between the decisionmaker's decision to terminate the plaintiff and the lower-level employee's racial animus. *See Wilson*, 952 F.2d at 946.

Other courts have relied upon a similar causal nexus requirement. In *Shager v. Upjohn Co.*, 913 F.2d 398 (7th Cir. 1990), the Seventh Circuit reviewed a plaintiff's claim that he

employment context. In its ruling on Wal-Mart's motion for summary judgment, the district court found that in order to prove a § 1981 claim a plaintiff must demonstrate: "1) the plaintiff is a member of a racial minority, 2) an intent to discriminate on the basis of race by the defendant and 3) the discrimination concerned one or more of the activities enumerated in the statute (i.e., make and enforce contracts, sue and be sued, give evidence, etc.)." J.A. at 41. It appears that the district court, relying on the Second and Fifth Circuits for the test, dispensed with the relevant *McDonnell Douglas/Burdine* burden-shifting analysis and grappled only with the ultimate question of Wal-Mart's intent to discriminate. *See id.* (stating that "while the Title VII burden shifting analysis is used in § 1981 employment discrimination matters based on race," the alternative three-part test was appropriate in non-employment contexts).

The Second Circuit was the first appellate court to fashion the above three-part standard. *See Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1087 (2d Cir. 1993) (applying three-part test to claim of race discrimination in arbitration proceedings based on right to legal process to enforce a contract). It was subsequently adopted by the Fifth Circuit in *Green v. State Bar of Texas*, 27 F.3d 1083, 1086 (5th Cir. 1994) (noting standard for § 1981 claim of discrimination based on right to make and enforce contract), the Seventh Circuit in the oft-cited decision *Morris v. Office Max, Inc.*, 89 F.3d 411, 413 (7th Cir. 1996) (noting that three-part standard applies to claim of discrimination in retail sales transaction), and, most recently, the Tenth Circuit in *Hampton v. Dillard Dep't Stores, Inc.*, 2001 WL 417289, *4 (10th Cir. April 24, 2001) (applying three-part test for prima facie case).[4] Christian would have us apply this three-part standard

---

[4] Notably, the Second, Fifth, and Seventh Circuits did not characterize this test as a prima facie test. Instead, these circuits noted generally that a plaintiff must prove these three elements to prevail under § 1981. A few subsequent district court cases and the Tenth Circuit have, however, implemented this three-prong test as the requirement for a prima facie case of discrimination. *See, e.g.*, *Holmes v. Dillard Dep't Store*, No.

as our prima facie test in the burden-shifting framework. Appellant's Br. at 10.

Wal-Mart asserts that the plaintiffs must meet a different, four-part prima facie test which has been adopted by several district courts. *See, e.g.*, *Laroche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1370 (S.D. Fla. 1999); *Singh v. Wal-Mart Stores, Inc.*, No. Civ.A. 98-1613, 1999 WL 374184, *6 (E.D. Pa. June 10, 1999); *White v. Denny's Inc.*, 918 F. Supp. 1418, 1424 (D. Colo. 1996). Under this test, a plaintiff must show: (1) she is a member of a protected class; (2) she attempted to make, enforce, or secure the performance of a contract; (3) she was denied the right to do so; and (4) the opportunity to make, enforce, or secure the performance of a contract for like goods or services remained available to similarly situated persons outside of the protected class. Appellee's Br. at 11. According to Wal-Mart, the plaintiffs can only prove a claim of discriminatory treatment if they can show that, under prong four of this test, comparable shoppers were similarly situated in "all respects" to the plaintiff. *Id.* at 12. To be deemed similarly situated, Wal-Mart would have us require a plaintiff to find shoppers who have "dealt with the same supervisor, been subject to the same standards, and engaged in the same conduct without differentiating or mitigating circumstances that would distinguish their conduct or the treatment afforded them." *Id.* at 13.

We note, from the outset, that we believe the district court was wrong, in the context of a Rule 50(a) motion, to omit the traditional burden-shifting framework from its analysis. Just as with Title VII cases, where "the allocation of burdens and the creation of a presumption by the establishment of a prima facie case is intended progressively to sharpen the inquiry into the elusive factual question of intentional discrimination," *Burdine*, 450 U.S. at 256 n.8, so too is the burden-shifting scheme useful to courts in assessing § 1981 claims of

Civ.A. 99-3444, 2000 WL 1725082, *2 (E.D. La. Nov. 17, 2000); *Bobbitt v. Rage Inc.,* 19 F. Supp. 2d 512, 517 (W.D.N.C. 1998).

unzipped her purse? A reasonable jury was not *required* to infer, based on Christian's concessions, that Monnot's actions were motivated exclusively by her concern that Christian was attempting to shoplift. Indeed, Christian's testimony does not tarnish the reasonable inference, established by the rest of Christian's testimony recounting how she had been watched, followed, and excessively offered assistance, that Monnot believed that Christian was more likely to shoplift because of her race. In other words, a jury could have believed that Monnot's suspicion was inextricably linked to race in that a store employee would never have been suspicious of a zipper noise had she not already targeted the customer as a potential shoplifter solely due to her race. In concluding that Christian's concession so overwhelmed the evidence favoring the plaintiffs such that no rational trier of fact could have found that plaintiffs were treated differently because of Christian's race, the district court impermissibly substituted its judgment concerning the weight of the evidence for the jury's.

At this point in the analysis, we must engage the question whether Clark's actions may be considered along with Monnot's for purposes of determining whether plaintiffs can establish a prima facie case because it was, after all, Clark's decision to remove the plaintiffs from the store that ultimately interfered with their right to contract. Wal-Mart asserts that Clark did not act with discriminatory intent and that he is not vicariously liable for Monnot's behavior. According to Wal-Mart, "the doctrine *respondeat superior* does not apply in a § 1981 claim." Appellee's Br. at 17. The plaintiffs argue to the contrary. We believe this question is better phrased as whether Monnot's discriminatory animus may properly be imputed to Clark, the decisionmaker who excluded plaintiffs from the store based on Monnot's shoplifting accusation, for purposes of establishing a prima facie case of race discrimination.

The district court correctly asserted that there is no record evidence that Clark saw the plaintiffs or knew the plaintiffs' race before he asked them to leave. Despite this finding, we

***

Q:  Because your perception was she thought you had concealed merchandise, or about to conceal merchandise because you just opened your purse?

A:  Yes, but I showed her what I had put in my purse.

Q:  Your perception was she approached you because she thought you were intending to steal merchandise?

A:  Yes.

Q:  You can understand how the zipping and unzipping of the purse late at night in a toy store where somebody has been an hour or two can be perceived that way?

A:  Yes.

Q.  The zipper was pretty loud, wasn't it?

A.  Yes.

J.A. at 141-42.  According to the district court, because Christian conceded that her actions gave rise to Monnot's suspicion, by Christian's own admissions Monnot's suspicion was not racially motivated.  J.A. at 246-47 ("I'm going to repeat again, by plaintiff's own admission she testified she understood that it could be perceived as if she were stealing. And this Court believes that is critical, critical, evidence in this case.").

We are not convinced that this evidence is as critical as the district court thought it was.  Christian conceded to broadly worded questions that Monnot approached her because Monnot could have believed she was shoplifting.  What is left unasked and unanswered is the next logical question, namely did Christian believe that Monnot thought she was intending to steal merchandise because she was a black person who had

intentional discrimination based on circumstantial evidence. *See Patterson v. McLean Credit Union*, 491 U.S. 164, 186 (1989) (approving of the use of the burden-shifting scheme "as a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination" for § 1981 claims) (internal quotation omitted); *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572 (6th Cir. 2000) (noting that plaintiff bringing § 1981 action may prove claim with either direct or circumstantial evidence of discrimination, and that *McDonnell Douglas/Burdine* tripartite test is appropriate where latter technique is employed).  The district court's omission does, however, offer us the opportunity to fashion from a clean slate an appropriate prima facie test in the commercial establishment context.

There is ample precedent for requiring a distinct formulation of the burden-shifting framework in differing factual circumstances.  *See Burdine*, 450 U.S. at 254 n.6 (stating that a prima facie standard articulated in *McDonnell Douglas* for claim of race discrimination "is not inflexible" as the prima facie proof required from a plaintiff "is not necessarily applicable in every respect in differing factual situations"); *see also Bobbitt*, 19 F. Supp. 2d at 516-17 (noting different standards under § 1981 for claims of failure to hire, failure to promote, failure to give merit pay raise, disparate punishment within the workplace, and failure to renew contract).  Thus, it would not be extraordinary for this court to adopt an individualized test for right to contract claims in the commercial establishment context.

Clearly, a plaintiff asserting a § 1981 claim must prove intentional discrimination.  *Gen. Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 389 (1982).  But it does not follow that the plaintiff must prove intentional discrimination as an element of the prima facie case.  As the Supreme Court has explained, the "division of intermediate evidentiary burdens serves to bring the litigants and the court expeditiously and fairly to this ultimate question [of intentional discrimination]."  *Burdine*, 450 U.S. at 253. According to the Court, the burden of establishing a prima

facie case of discriminatory treatment is not meant to be "onerous." *Id*. The purpose of the prima facie case is simply to "eliminate[] the most common nondiscriminatory reasons for the plaintiff's" treatment, *id.* at 254; a prima facie case "raises an inference of discrimination only because we presume [the defendant's] acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Id.* (quoting *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978)).

In the employment context, a plaintiff may establish a prima facie case of intentional discrimination without having direct evidence of the defendant's intent to discriminate; indeed, the rationale for employing a prima facie case is to allow a plaintiff to create a "legally mandatory, rebuttable presumption" of discrimination with only circumstantial evidence. *Id.* at n.7. Therefore, we find it curious that so few courts have paused to remark upon the incongruity of dispensing with a prima facie test, or requiring a plaintiff to prove intentional discrimination as an element of a prima facie case in the commercial establishment context, as the plaintiffs would have us do. Recently, a district court in Maryland engaged in an analysis of the proper elements of a prima face case in the commercial establishment context.

In *Callwood v. Dave & Buster's, Inc.*, 98 F. Supp. 2d 694, 705 (D. Md. 2000), the district court recognized that there were two competing tests for § 1981 claims in the commercial establishment context. Critiquing the three-part test utilized by the district court in the instant case, the *Callwood* court noted:

> [T]his formulation erroneously collapses the overall elements of a section 1981 claim with the elements of a prima facie case. In particular, to the extent that any formulation of the elements of a prima facie case includes a requirement that the plaintiff show that the defendant had an intent to discriminate on the basis of race, such a formulation is inappropriate because the very point of the prima facie case requirement is to provide a

There are, however, undisputed facts that temper those that establish a prima facie case. First, as the district court indicated, Monnot attempted to cancel the call to the police. This piece of information is significant because it creates the inference that Monnot called the police solely to prevent what she perceived was shoplifting, not to exclude a black customer from shopping at Wal-Mart. Had Monnot's motivation been to prevent or intimidate Christian from purchasing merchandise, she would arguably have had no reason to try to call off the police. Because we must construe all facts in favor of the nonmovant at this stage of the proceedings, however, we cannot attach too much significance to the fact that Monnot attempted to turn the police away in light of the fact that we must presume that Monnot fabricated the shoplifting incident. Although both parties admit that a purse was unzipped, we must believe that Christian went into her purse for a personal item, not that she reached with one hand to place a toy in her purse and zipped her purse with her other hand, as Monnot testified. On the facts before us as we must find them, we believe that a reasonable jury could have inferred that Monnot's motivation for canceling the call to the police was because Monnot became ashamed or embarrassed by her actions or did not want to cause a scene, although she had wanted to have Christian removed from the store. By emphasizing the fact that Monnot tried to cancel the call to the police without considering that piece of evidence in the context of Christian's version of the events, the district court erred.

The other allegedly negative fact relied upon heavily by the district court was that Christian testified that her actions, as opposed to her race, gave Monnot cause to believe she was shoplifting. The following testimony was elicited by Wal-Mart's attorney from Christian on cross-examination:

Q:   Isn't it true, it was your perception, is what made her [Monnot] jog up to you was the fact that you opened and closed your purse?

A:   Yes.

reasonable inferences regarding Monnot's discriminatory acts:[9] 1) Monnot watched and followed Christian but not Edens despite the fact that Christian had a shopping cart while Edens was shopping without a cart; 2) Monnot offered Christian assistance six times, but never offered to assist Edens; 3) Monnot commenced to watch Edens after realizing that the two women were together; 4) Monnot reported to her manager that she witnessed a shoplifting incident, which did not occur; and 5) Monnot directed the police to remove Edens from the store because she was with Christian. Taken alone, these inferences arguably create the presumption of an intent to discriminate in that these acts "are more likely than not based on the consideration of impermissible factors." *Burdine*, 450 U.S. at 254. Other facts brought out at trial also support the inference of discrimination. Monnot testified that, even prior to the zipper incident, she was suspicious of Christian and Edens because they had spent a long time in the toy department and they did not appear to have many items in their cart. J.A. at 162. Christian, on the other hand, had testified that her cart was half full at the moment when the zipper incident occurred. She stated that she had in it a Batman space ship, a large baby stroller, coloring books, books, crayons, and action figures. J.A. at 125. Christian's testimony, when taken in the light most favorable to her, casts doubt upon Monnot's assertion that Christian was behaving unusually or suspiciously prior to the zipper incident.

---

[9]Although Christian attempted to frame Monnot's violation of Wal-Mart's policy for shoplifters as proof of Monnot's intent to discriminate, Christian's evidence — that Monnot failed to keep her eyes on Christian at all times and that the police were summoned before Christian reached the cash register — are outweighed by Monnot's undisputed testimony that she was unaware of Wal-Mart's policy with regard to shoplifters, that she believed it was her responsibility to tell her manager about suspicious activity, and that she called the police because her manager ordered her to do so. Monnot cannot have deliberately violated Wal-Mart's shoplifting policy in an effort to exclude African-American shoppers if she were unaware of the policy. Therefore, we conclude that this aspect of Christian's theory of intentional discrimination is inadequate to establish a prima facie case. We will, however, consider the probative value of the various acts which were alleged at trial.

basis for inferring the existence of a discriminatory motive.

*Id.* at 705. In crafting its own prima facie case, the *Callwood* court attempted to account for the differences between the commercial establishment and the employment contexts. Speaking to the problem of developing a "similarly situated" prong for a commercial establishment test, that court noted that employment decisions are "regularized and periodic, are made by supervisory personnel, and by their very nature are almost always documented . . . .[They] leave behind a paper trail of evidence which to a greater or lesser extent will be available during discovery or otherwise to a discrimination victim." *Id.* at 706. Therefore, in the employment context it makes sense to insist upon evidence of "similarly situated applicants or employees." *Id.* In the commercial establishment context, on the other hand, the clientele is "largely itinerant," and the task of producing similarly situated persons outside the protected group is much more difficult. *Id.*

With these distinctions in mind, the *Callwood* court determined that a plaintiff must show the following for a prima facie case of discrimination in a commercial establishment:[5]

(1) she is a member of a protected class;
(2) she made herself available to receive and pay for services ordinarily provided by the defendant to all members of the public in the manner in which they are ordinarily provided; and
(3) she did not enjoy the privileges and benefits of the contracted for experience under factual circumstances which rationally support an inference of unlawful discrimination in that

---

[5]Of course, after establishing a prima facie case, the district court noted that the other aspects of the *McDonnell Douglas/Burdine* burden-shifting framework must be considered.

(a)  she was deprived of services while similarly situated persons outside the protected class were not deprived of those services, and/or

(b)  she received services in a markedly hostile manner and in a manner which a reasonable person would find objectively unreasonable.

*Id.* at 707.[6]

According to *Callwood*, subparts (1) and (2) are consistent with the standard prima facie elements as adopted by other courts. Subpart (3)(a) is designed to invoke the "similarly situated" test, but is written with the understanding that "the comparison will never involve precisely the same set of . . . [conduct] occurring over the same period of time and under the same sets of circumstances." *Id.* at 707 (internal quotation omitted). Moreover, the phrase "deprived of services" in subpart (3)(a) is written to encompass more than just an outright denial of services. "By encompassing the deprivation of services . . . , subpart (3)(a) protects against discriminatory conduct by retailers which, while not necessarily constituting a denial of services, nevertheless impinges on the 'benefits, privileges, terms, and conditions of the contractual relationship.'" *Id.* (citation omitted).

Subpart (3)(b) is written as an alternative to (3)(a) to account for situations in the commercial establishment context in which a plaintiff cannot identify other similarly situated persons. *See id.* at 708. Under this subpart, a retailer's "markedly hostile" conduct may "give rise to a rational inference of discrimination sufficient to support a prima facie case" without any evidence of how similarly situated persons were treated. *Id.* Factors relevant to subpart (3)(b)'s "markedly hostile" component include whether the

---

[6] At least one other district court has adopted the test put forward in *Callwood. See Lizardo v. Denny's, Inc.*, No. 97-CV-1234 FJS GKD, 2000 WL 976808, *3 (N.D.N.Y. 2000).

on the assumption that Christian was offered assistance by Monnot six times during the hour and three quarters that she was in the store, that Christian did not place a toy in her purse, and that she had a shopping cart with several toys in it when she was asked to leave the store.

When we analyze Christian's case under our prima facie test, we easily conclude that Christian meets the first two prongs of the test. First, as an African-American, she is a member of a protected class. Second, we have no trouble concluding that Christian made herself available to enter into a contractual relationship for services ordinarily provided by Wal-Mart: the record reflects that she had selected merchandise to purchase, had the means to complete the transaction, and would, in fact, have completed her purchase had she not been asked to leave the store. This case involves none of the difficulties that other courts have encountered in determining whether there was a valid contract interest at stake. *Cf. Bagley v. Ameritech Corp.*, 220 F.3d 518, 521 (7th Cir. 2000) (holding that assistant manager's statement "I will not serve [you]" plus her use of the middle finger directed toward plaintiff did not establish § 1981 claim for refusal of service because plaintiff could have tried to receive service from other salespeople in store); *Morris*, 89 F.3d at 414-15 (noting that "claim for interference with the right to make and enforce a contract must allege the actual loss of a contract interest, not merely the possible loss of future contract opportunities" and rejecting plaintiffs' claim because they failed to demonstrate that they would have made a purchase had they not been asked to leave the store). Therefore, our analysis will focus on the third part of our prima facie test: whether Christian alleged sufficient facts to create a material issue of fact that she was deprived of services while similarly situated persons outside the protected class were not and/or that she received services in a markedly hostile manner and in a manner which a reasonable person would find objectively discriminatory.

Having thoroughly reviewed the trial transcripts, we believe that the testimony could have produced the following

attempted to create a presumption of intentional discrimination by proving that Monnot's and Clark's interaction with Christian deviated from Wal-Mart's established procedures regarding shoplifters. According to plaintiffs' theory, Clark is liable for Monnot's behavior under the doctrine of respondeat superior. Wal-Mart counters that Christian has not provided any evidence of disparate treatment as compared with other similarly situated shoppers.

The district court, evaluating Christian's evidence to determine whether "there is any legally sufficient evidentiary basis for a reasonable jury" to find intentional discrimination, determined that Christian could not establish a § 1981 claim based either on Monnot's or Clark's actions. J.A. at 246. The district court first stated that "[t]he issue is whether Rose Monnot reasonably perceived a shoplifting situation and therefore acted on that perception and not on the basis of race." J.A. at 247. According to the district court, there was no evidence "that Rose Monnot treated this black woman Lois Christian any differently from the manner in which she would have treated a white person" or that Christian was "under constant surveillance." J.A. at 247-48. The district court concluded that "there is no evidence that [Christian] did not have the same right to make and enforce a contract because she was allegedly being watched." J.A. at 248. The court also stated that Christian was not discriminated against when she was asked to leave the store because "[t]he evidence is uncontroverted that Richard Clark is the one who made the decision" to ask the plaintiffs to leave and he was unaware of Christian's race. J.A. at 248.

We must engage in a de novo review of all the record evidence to determine whether Christian could establish, by a preponderance of the evidence, a presumption of discrimination through circumstantial evidence. We must reverse the district court if the plaintiffs presented sufficient evidence to raise a material issue of fact for the jury. Construing all disputed facts in favor of the plaintiffs, as we must do when reviewing a judgment granted as a matter of law, and granting them all reasonable inferences, we proceed

conduct "is (1) so profoundly contrary to the manifest financial interests of the merchant and/or her employees; (2) so far outside of widely-accepted business norms; and (3) so arbitrary on its face, that the conduct supports a rational inference of discrimination." *Id.*

We believe that while the three-part test employed by the district court in the instant case adequately represents the plaintiff's *ultimate* burden of proof in a § 1981 action, it is inappropriate for use as a prima facie standard. Although plaintiffs advocate its use, we believe that it propagates the false notion that a plaintiff must provide direct evidence of the defendant's "intent to discriminate" as part of the first stage of the *McDonnell Douglas/Burdine* burden-shifting framework. Because the implementation of the three-part test would turn the purpose of the prima facie case on its head, we reject that test.

We also cannot adopt the four-part test put forth by the defendant in this case because it narrows the methods available to a plaintiff to prove intentional discrimination.[7] By holding a plaintiff to the requirement that she produce similarly situated persons who were not discriminated against, we would be foreclosing other methods of proving intentional discrimination. This test is also particularly onerous because of the difficulty in replicating a particular shopper's experience. The challenge of locating similarly situated persons is highlighted by the case, *Singh v. Wal-Mart Stores, Inc.*, No. Civ.A. 98-1613, 1999 WL 374184, *6 (E.D. Pa. June 10, 1999), to which Wal-Mart cites approvingly. In *Singh*, the district court rejected a plaintiff's § 1981 claim where the plaintiff could not show he was similarly situated in all respects to other customers who were provided a

---

[7] The defendant's four-part test would require a plaintiff to prove: (1) she is a member of a protected class; (2) she attempted to make, enforce or secure the performance of a contract; (3) she was denied the right to do so; and (4) the opportunity to make, enforce or secure the performance of a contract for like goods or services remained available to similarly situated persons outside of the protected class.

different level of service. According to the district court, plaintiff's claim failed because he could not point to any other customer who "had attempted to return an out-of-warranty appliance, purchased another identical appliance and then again attempted to make a return the next day at the same store in the presence of an employee who witnessed the events of the prior day and had been alerted to a conversation in which the customer or his companion discussed replicating the purchase and using the new receipt to do a swap." *Singh*, 1999 WL 374184, *7. By virtue of its inflexibility and severity, the *Singh* court's "similarly situated" test virtually forecloses the possibility that a plaintiff could ever successfully raise a § 1981 disparate treatment claim in the commercial establishment context.

Upon consideration, we conclude that the *Callwood* court's three-part prima facie test is the most useful to courts evaluating claims of race discrimination in the commercial establishment context and we therefore adopt it as our own. In a § 1981 commercial establishment case, a plaintiff must prove:

(1)  plaintiff is a member of a protected class;
(2)  plaintiff sought to make or enforce a contract for services ordinarily provided by the defendant; and
(3)  plaintiff was denied the right to enter into or enjoy the benefits or privileges of the contractual relationship in that (a) plaintiff was deprived of services while similarly situated persons outside the protected class were not and/or (b) plaintiff received services in a markedly hostile manner and in a manner which a reasonable person would find objectively discriminatory.

The test's advantages are many. First, it best accounts for the differences in circumstances between employment and commercial establishment claims. The test offers the most traditional method of proving discrimination, namely by demonstrating discriminatory treatment with respect to similarly situated persons. It also allows a plaintiff to state a

claim when similarly situated persons are not available for comparison, as will often be the case in the commercial establishment context.

Second, the language in subpart (3)(a) which makes actionable the deprivation of service, as opposed to an outright refusal of service, better comprehends the realities of commercial establishment cases in which an aggrieved plaintiff may have been asked to leave the place of business prior to completing her purchase, refused service within the establishment, or refused outright access to the establishment. It is thus in harmony with the promise of § 1981(b), which guaranties all persons equal rights in "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."

Finally, this broader protection also accords with our circuit precedent. In *Watson v. Fraternal Order of Eagles*, 915 F.2d 235, 243 (6th Cir. 1990), this court held that in order to state a claim for discrimination under § 1981 a plaintiff need not actually be refused service by a private club because such a standard would allow "commercial establishments [to] avoid liability merely by refusing minorities entrance to the establishment before they had the chance to order." *Id.* Under *Watson*, the plaintiff need only show that she intended to make a purchase and was asked to leave the establishment in order to prevent her from making the purchase on account of her race in order to satisfy the "make and enforce contracts" clause of §1981.[8]

## C.  Christian's § 1981 Claim

Having determined the appropriate test to apply, we must now evaluate plaintiffs' claims to determine whether plaintiffs were intentionally discriminated against during the making or enforcement of a contract with Wal-Mart. Plaintiffs have

---

[8]Although *Watson* was decided before the 1991 amendments to § 1981, this portion of its holding is still good law.