NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0005n.06

Case No. 24-1357

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

**FILED**
Jan 08, 2025
KELLY L. STEPHENS, Clerk

TAMICA BRANSCUMB, )
  Plaintiff-Appellant, )
   )
v. )
   )
HORIZON BANK, )
  Defendant-Appellee. )
   )

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN

OPINION

Before: SUTTON, Chief Judge; KETHLEDGE and MURPHY, Circuit Judges.

SUTTON, Chief Judge. When Tamica Branscumb deposited a $22,616 check into her checking account, Horizon Bank paused to ensure it was real in view of several prior overdrafts. The bank placed a hold on releasing the funds, then lifted the hold when she provided evidence of its legitimacy. Branscumb sued the bank for race discrimination. The district court found no evidence of discriminatory intent and granted summary judgment for the bank. We affirm.

I.

This case begins at the end of another. In March 2022, Branscumb, a black woman, received $22,616 as part of a settlement of a housing-discrimination lawsuit that she filed against Sun Homes. On March 23, she picked up the check from her attorney and deposited it at Horizon Bank, where she had a "Fresh Start" checking account. She opened the Fresh Start account after Horizon closed her prior account due to a negative balance.

When she brought the $22,616 check to the Horizon Bank branch in St. Joseph, Michigan, the large sum caught the employees' attention. Branscumb had never made such a large deposit before, and her Fresh Start account was frequently overdrawn.

Customer service representative Kayla Betker questioned the check's authenticity. In Branscumb's telling, Betker mentioned that there was a lot of "fraud going on" and asserted, "[Y]ou do know if it came in the mail it's not real, right?" R.56-6 at 9–10. Betker took the check and placed a standard hold on it for large deposits. She explained that, under the hold policy for all large checks, Branscumb could access $225 of the check immediately, $5,300 on the second business day, and the rest on the seventh.

This led to an awkward meeting on the third business day, March 26. After confirming that her checking account included the $225 and $5,300 amounts, Branscumb went to the drive-through counter at Horizon's Benton Harbor branch to withdraw $5,000 in order to buy a used car. Some "red flags" gave the teller Michelle Shuey pause and prompted her not to release any money from the check. R.54-17 at 9. Like Betker, she noticed that Branscumb had never deposited such a large check before, much less one from a company on the other side of Michigan. Worse still, Horizon had just suspended Branscumb's savings account for keeping a 25-day-long negative balance, and Horizon's check verification software Verafin warned Shuey that the check posed a "high risk transaction." R.56-10 at 7.

Branch manager Alexis Harris confirmed Branscumb's identity and told her that the check was "suspicious." R.56-6 at 13. Branscumb told Harris that the check came from the settlement of a lawsuit. Harris feared that the check was "fraudulent," and told Branscumb that she couldn't release any money from the check at that time. R.56-6 at 13. The employees placed a new hold on the check, this time on the entire check because it was a "potentially fraudulent item." R.54-7

at 2; R.54-25 at 2; R.54-17 at 21. Shuey told Betker not to release any funds while Harris froze Branscumb's account.

On March 28, Branscumb called her attorney, who called the bank. She also brought documents verifying the lawsuit settlement to the St. Joseph Horizon Bank branch. With the settlement confirmed, Horizon lifted the hold that day.

Branscumb withdrew her money, closed her accounts, and sued Horizon for race discrimination under federal law (42 U.S.C. § 1981) and Michigan law (the Elliott-Larsen Civil Rights Act). The district court granted Horizon Bank's motion for summary judgment.

## II.

Branscumb raises two issues on appeal: Did the district court improperly consider hearsay testimony when it ruled on the summary judgment motion? Did the court correctly grant Horizon's motion for summary judgment?

*Hearsay.* Recall that, during Horizon's investigation of the validity of Branscumb's check, bank employees ran check-verification software on the check. During her deposition, bank employee Shuey testified that the Verafin program showed that the check posed a "high risk transaction." R.56-10 at 7. At issue is whether Shuey's deposition testimony about the Verafin software result amounts to inadmissible hearsay.

Trial courts generally may not consider inadmissible hearsay on summary judgment. *Wiley v. United States*, 20 F.3d 222, 226 (6th Cir. 1994). Supporting affidavits must "set out facts that would be admissible in evidence." Fed. R. Evid. 56(c)(4). Hearsay consists of out-of-court statements made for "the truth of the matter asserted." Fed. R. Evid. 801(b), (c). A statement used to establish its effect on a listener is not hearsay because the statement's underlying truth is beside the point. *See United States v. Boyd*, 640 F.3d 657, 664 (6th Cir. 2011).

3

The problem for Branscumb is that Horizon offered the testimony about the results of the Verafin scan to show its effect on Shuey, not for its truth. Shuey testified that the computer screen for Verafin said "there was a list of warnings on the account," leading her to *believe* the check was invalid. R.56-10 at 7. The truth of the proposition—whether Branscumb proffered a valid check or not—did not drive Shuey's belief. Her statement about what she saw is not hearsay. On this record, we thus need not consider whether a computer amounts to a hearsay declarant, a point not briefed by the parties. *See Patterson v. City of Akron*, 619 F. App'x 462, 480 (6th Cir. 2015).

Branscumb objects that Horizon forfeited this argument by failing to raise the point until its reply brief in the district court. But the bank had no reason to brief the point before then. Branscumb first raised the hearsay objection in her opposition brief. That gave Horizon the right to use the reply brief to do what reply briefs do—"*reply* to arguments made in the response brief." *Scottsdale Ins. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008) (quotation omitted).

Branscumb complains that Shuey's testimony contained hearsay within hearsay. But she forfeited this argument by waiting until after the district court granted summary judgment to raise it. *See Morgan v. Trierweiler*, 67 F.4th 362, 367 (6th Cir. 2023). The argument fails on the merits anyway. Double hearsay consists of a hearsay statement incorporating another hearsay statement. Fed. R. Evid. 805 advisory committee note. Even if Shuey's affidavit were hearsay, the outer statement is Verafin's declaration that the check posed a "high risk transaction." R.56-10 at 7. The Verafin screen did not say that *someone else* said that the check was risky. No reversible error occurred.

*Summary judgment.* That leaves the question whether the district court correctly granted Horizon's summary judgment motion. In giving fresh review to that ruling, we ask whether Branscumb's claims present a "genuine dispute as to any material fact" and, if not, whether

Horizon is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In resolving these questions, we draw all reasonable inferences of fact in Branscumb's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986).

Branscumb sought relief under 42 U.S.C. § 1981 and Michigan's Elliott-Larsen Civil Rights Act. Section 1981 provides: "All persons . . . shall have the same right . . . to make and enforce contracts, . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). Michigan's Elliott-Larsen Act provides: A person shall not "[d]eny an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation or public service because of religion, race, color, national origin, age, sex, sexual orientation, gender identity or expression, or marital status." Mich. Comp. Laws § 37.2302(a).

A common framework unites the two laws. Both laws require a claimant "to establish that race is a 'but-for' cause of the injury." *Gray v. AutoZoners, LLC*, No. 22-1069, 2022 WL 16942609, at *3 (6th Cir. Nov. 15, 2022) (per curiam) (citing *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 329–30 (2020); *Hecht v. Nat'l Heritage Acads., Inc.*, 886 N.W.2d 135, 146 (Mich. 2016)). Both laws permit a claimant to establish but-for causation by "direct evidence or circumstantial evidence." *Id.* And both laws use the Title VII standard explicated in *McDonnell Douglas* when a claimant, as here, tries to prove intentional discrimination through circumstantial evidence. *Id.*; *see Sniecinski v. Blue Cross & Blue Shield of Mich.*, 666 N.W.2d 186, 193 (Mich. 2003); *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992).

Under the *McDonnell Douglas* rubric, Branscumb must prove a prima facie case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973). If she does, Horizon must produce "some legitimate, nondiscriminatory reason" for its actions. *Id.* at 802.

5

If Horizon meets that burden, Branscumb must show that those reasons are pretextual. *Id.* at 804. Throughout, the claimant bears the "ultimate burden of" proving illegal discrimination by "a preponderance of the evidence." *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981).

A last word (or two) about the prima facie case—the key issue joined by the parties on appeal. To meet this requirement, Branscumb must show that she (1) "is a member of a protected class," (2) "made herself available to receive and pay for" the bank's services, and (3) "did not enjoy the privileges and benefits of" them due to circumstances that "rationally support an inference of unlawful discrimination." *Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862, 871 (6th Cir. 2001) (quotation omitted).

Precedent offers Branscumb two ways to establish an inference of unlawful discrimination in this context. *See Keck v. Graham Hotel Sys., Inc.*, 566 F.3d 634, 640–41 (6th Cir. 2009). One turns on whether the bank failed to provide her services available to "similarly situated persons outside the protected class." *Christian*, 252 F.3d at 871 (quotation omitted). The other turns on whether, even if she did receive the relevant services, the bank provided them in a "markedly hostile manner" that a "reasonable person would find objectively discriminatory." *Id.* at 872. Branscumb relies only on this second path. To assess whether Horizon offered "markedly hostile" service, this court looks to whether the conduct was "so profoundly contrary" to the merchant's financial interests, "so far outside" business norms, or "so arbitrary" that it "supports a rational inference of discrimination." *Id.* at 871 (quotation omitted); *see Keck*, 566 F.3d at 641.

By these lights, the bank did not provide Branscumb with "markedly hostile" services. Start with the bank's response when Branscumb deposited the check on March 23. Betker acted in service of, not contrary to, Horizon's financial interests, by asking whether the check was fraudulent and by telling her that checks by "mail" were "not real." R.56-6 at 10. The same is

6

true when Betker imposed a deposit hold, which was consistent with Horizon's policies for large deposits. That protected Branscumb too, who would have owed any withdrawn funds had the check bounced. All of this followed the relevant norms in the industry. Federal banking regulations permit banks to delay large deposits, especially those in accounts with "repeated overdrafts" or where the bank had "reasonable cause" to believe the check was uncollectible. 12 C.F.R. § 229.13(b), (d), (e). Nor was Betker's concern arbitrary. Branscumb had a history of overdrawing her account and had never deposited such a large check before.

When bank employees Harris and Shuey refused to let Branscumb withdraw $5,000 on March 26, that was not markedly hostile either. Like Betker, these employees protected Horizon's business interests. Shuey saw that Branscumb wanted $5,000 but could not "cover what she was taking out" had the check bounced. R.56-10 at 5. Nor had Branscumb "ever deposited anything" from the check's issuer, a business "from the other side of the state." R.56-10 at 5. Nor were the employees "familiar with" Branscumb, who came to this branch only because she was in a rush to buy a car that day. R.45-7 at 7. Compounded with the Verafin screen—which usually displayed "no results found" but now cautioned a "high risk transaction" where there "may have been fraud," R.56-10 at 7—the tellers saw serious risk. Imposing a new hold on the check funds to investigate further would protect both "the customer and the Bank from loss." *See* R.54-23 at 2. Those protective measures hardly lie outside industry norms or rational behavior. Nor were these measures unduly harsh to Branscumb. One business day later, after she produced evidence of the settlement, the bank allowed Branscumb to withdraw $15,000, well before the normal seven-day window for out-of-the-ordinary checks. On this record, Branscumb has not shown a prima facie case of discrimination.

Branscumb's battery of rebuttals falls short. She contends that Betker's and Harris's statements about checking her identification and doubting the check's legitimacy conjured a stereotype that, "if a poor black woman came into money, it probably was fraudulent." Appellant Br. 35. And she points to a message from Ciara Kearney, another teller, to Betker on March 28, suggesting that Branscumb "needed time to figure out lies . . . unless the check isn't fraudulent which [I] high[ly] doubt." R.56-3 at 3. With respect, that's not enough. Given the warning signs—the size of the check, her previously overdrawn account, the Verafin scan—the employees' skepticism did not indicate markedly hostile service. *See Downing v. Life Time Fitness*, 483 F. App'x 12, 16–17 (6th Cir. 2012) (per curiam). To the contrary, Horizon generally directed employees to "stop the transaction and advise the customer" if they doubt a check's validity. R.54-23 at 2. The employees' statements reflect an "honest belief" about the check's risks and show a "reasonably informed and considered decision." *Braithwaite v. Timken Co.*, 258 F.3d 488, 494 (6th Cir. 2001) (quotation omitted).

Branscumb claims that the bank acted pretextually by departing from normal procedure and refusing her withdrawal two business days after she deposited the check. But this claim conflates *McDonnell Douglas*'s first step of prima facie discrimination with the third step of pretext. Nor would this be true even if we reached that pretext step. According to the terms of Branscumb's account, Horizon reserved the right to delay funds if it reasonably "believe[d] a check" would "not be paid." R.54-8 at 14.

That leaves the reality that Horizon erroneously thought the check fraudulent. But, as we explained above, it was rational to be concerned about this risk until Branscumb established the bona fides of the large settlement. Skepticism about an unprecedentedly large check by an unfamiliar business in an under-funded account withdrawn at an irregular branch reflects a rational

business choice. Keep in mind that, if the check had bounced and if Horizon had permitted the withdrawal, Branscumb would have been stuck with a used car and a $5,000 debt.

Branscumb insists that the Horizon employees' testimony stating that she was "angry," "yelling," and "snippy" at the drive-through painted her with the stigma of a "suspicious, angry black woman." Appellant's Br. 38–41. But Branscumb does not connect her indignation about these recollections during the depositions in August 2023 to a prima facie case of discrimination in March 2022. And she provides mere "speculation or conjecture" that the employees, who did not discuss race at all, invoked these stereotypes. *Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir. 2004). A reasonable jury could not infer from such thin gruel that Horizon engaged in race discrimination against her.

We affirm.