Vincent A. HILL, et al., Appellants,

v.

MEDLANTIC HEALTH CARE
GROUP, et al., Appellees.

Nos. 05–CV–776, 05–CV–806.

District of Columbia Court of Appeals.

Argued May 22, 2007.

Decided Oct. 4, 2007.

Veronice A. Holt, with whom Douglas Bernard Evans, Sr., Washington, DC, was on the brief, for appellants.

Alfred F. Belcuore, Washington, DC, for appellee Levitt.

Paul M. D'Amore, with whom Daniel C. Costello, Annapolis, MD, was on the brief, for appellees Medlantic and DiPasquale.

Before REID and BLACKBURNE-RIGSBY, Associate Judges, and WAGNER, Senior Judge.

BLACKBURNE–RIGSBY, Associate Judge:

In this consolidated appeal, Vincent and Peggy Hill, appellants, challenge the trial court's grant of appellees' motion for judgment as a matter of law at the close of appellants' case. Appellants contend that, contrary to the trial court's ruling, they established a *prima facie* case on their claims of negligence, abandonment, and informed consent. They also argue that the trial court erred in granting appellees' pretrial motions for partial summary judgment on their other multiple counts.[1] Discerning no error, we affirm.

We first discuss the trial judge's proper grant of Judgment as a Matter of Law on appellants' remaining claims after the close of appellants' case. We conclude that appellants' expert, though initially qualified as an expert, failed to provide a basis for his knowledge of the applicable national standard of care, or a basis for his opinion that Mr. Hill's physicians breached the national standard of care in their treatment of his injuries. We require that an expert provide an independent basis for his knowledge of the applicable national standard of care and for his opinion regarding compliance with or breach of such standard. Absent such a basis and linkage, the expert would simply be providing a personal opinion as to the course of treatment he would have taken in treating the patient. This is insufficient for a medical malpractice case. An expert in a medi-

cal negligence case must establish that his opinion is grounded in a national standard of care and not merely his personal opinion. The expert must demonstrate that the doctor in question failed to do what a reasonable doctor nationally would have done in the same course of treatment. Appellants' expert failed to meet this standard.

Second, we address appellants' contention that the trial court improperly granted partial summary judgment on their breach of contract (42 U.S.C. § 1981), breach of contract (duty of fair dealing and good faith), civil conspiracy, intentional infliction of emotional distress, and punitive damages causes of action. We conclude that the trial court properly granted partial summary judgment. Following a discussion of the relevant factual background, we will address each issue in turn.

## I. Factual Background

On July 21, 1997, Mr. Hill fractured the tibia and fibula bones in his lower left leg in a motorcycle accident[2] and was taken by ambulance, at his request, to the emergency room at Washington Hospital Center ("WHC"). Dr. Levitt recommended to Mr. Hill that an external fixation procedure be performed on his leg, however, Mr. Hill did not want an external fixation because he thought it looked painful based on what he saw in a movie. Mr. Hill informed Dr. Levitt that he preferred an internal fixation instead because he knew his bones took a long time to heal, and he was afraid of getting infected because of "those rods and stuff being outside going inside my leg."[3] Dr. Levitt performed the

---

1. The summary judgment order dismissed appellants breach of contract (42 U.S.C. § 1981), breach of contract duty of fair dealing and good faith, civil conspiracy, intentional infliction of emotional distress, and punitive damages causes of action.

2. Mr. Hill rode motorcycles as a hobby and, at one time, raced professionally.

3. Mr. Hill's expert, Dr. Bryant Bloss, testified that in an external fixation, the "fixation" is outside the body, except for the penetration of

internal fixation operation on Mr. Hill. Prior to the operation, Mr. Hill signed a consent form, but added a handwritten note on the form indicating that he wanted a board certified anesthesiologist to administer the anesthesia.

On October 20, 1998, during a follow-up visit with Dr. Levitt, Mr. Hill expressed concern that his "leg was starting to look like it was charcoal ... it looked dead, lifeless" in the area of the operation. Dr. Levitt told Mr. Hill that some darkness was to be expected. Mr. Hill scheduled a follow-up visit for December 1998, but was unable to make it because he was sick. Mr. Hill testified that by then his leg had "developed like a blister and ... had pus coming out of [it]." Mr. Hill did not think the blistering or dark color of the skin were related to the operation, so he decided to see a dermatologist, Dr. Lindgren. Dr. Lindgren took a skin culture and informed Mr. Hill that he had a staphylococcal infection. She treated the infection, but told him to return to Dr. Levitt if he had further concerns about his leg, which Mr. Hill did. A few days later, Dr. Levitt informed Mr. Hill that the hardware in his leg was infected and had to be removed immediately. Dr. Levitt performed a second surgery on Mr. Hill on February 11, 1998, which Mr. Hill thought was intended to remove every piece of metal in his leg. After the surgery, a Groshong catheter was placed in his chest so that he could take Vancomycin, an antibiotic, intrave-

nously.[4] On March 4, 1998, Mr. Hill called Dr. Levitt's office complaining of pain in his leg and that he heard a "crack" in his leg. He scheduled an appointment with Dr. Levitt for that day, and an x-ray revealed that he still had two screws on each side of his leg where it was broken.[5] On April 6, 1998, after several follow-up visits, Dr. Levitt informed Mr. Hill that another surgery was needed to remove over one-inch of the infected bone which would result in a 50% loss of the strength in that bone. During that visit, Mr. Hill, feeling like "an experiment gone bad," "fired" Dr. Levitt.

Dr. Levitt referred Mr. Hill to Dr. DiPasquale, an orthopedic surgeon, and noted that she was known for her knowledge about osteomylitis (infections of the bone). Mr. Hill contends that Dr. Levitt never informed him, until that time, that he had osteomylitis. He contends that Dr. Levitt had only informed him that his "hardware" was infected. Mr. Hill met with Dr. DiPasquale, and she recommended a treatment plan which included performing an operation on April 16, 1998, to remove the infected bone and then inserting antibiotic beads into the leg.

Prior to the April 16, 1998 operation, Dr. DiPasquale informed Mr. Hill that Dr. Levitt would have to assist on any future operations, to which Mr. Hill strongly objected. Mr. Hill, however, consented to Dr. Levitt's presence in the operating

---

pins. He explained that with an external fixation, rods and a ring type device are used to secure the fracture together. In contrast, with an internal fixation, "an incision is made usually over the fracture site and the bones are manipulated ... usually under fluoroscopy control you don't have adequate visualization and then the bones are fixed with a combination of plates and screws and pins." Dr. Bloss also testified that an internal fixation provides a shorter healing time and greater stability to the joints.

4. The Groshong catheter is placed close to the heart; there is a tube that Mr. Hill used to insert the Vancomycin that would flow through the veins.

5. Appellees argued, throughout the litigation, that the screws were left in the bone intentionally to provide support.

room as long as Dr. Levitt did not touch him.[6] When Mr. Hill received the consent form for his operation, both Dr. DiPasquale and Dr. Levitt's names were listed, at which point Mr. Hill "lost it" and "hit the ceiling." He felt as though Dr. Levitt had butchered his leg, and he did not want Dr. Levitt to touch him again. Later that day, Dr. DiPasquale informed Mr. Hill that she was canceling the surgery and provided him with the names of three doctors who could provide care for him.[7]

Mr. Hill eventually went home, conducted his own internet research, and located Dr. Tetsworth, who was not one of the three doctors recommended by Dr. DiPasquale. After an initial appointment, Dr. Tetsworth then scheduled a surgery for May 7, 1999, at which point he partially removed the infected bone and inserted antibiotic beads into the infected leg. Over the course of the following year, Mr. Hill had several subsequent surgeries to his leg, and on October 5, 1999, his bone was deemed healed. One leg is now permanently shorter than the other one, however, and he has a deformity where a muscle had to be moved from his thigh and placed in his ankle.

On July 17, 2000, Mr. Hill and Mrs. Hill (appellant's wife) filed the present action.[8] On July 23, 2003, the trial court granted defendants, Dr. Levitt's and Dr. Danzinger's,[9] Motion for Partial Summary Judgment as to punitive damages; and defendants' Dr. DiPasquale and WHC, Motion for Partial Summary Judgment as to punitive damages. On April 5, 2005, the trial court granted summary judgment as to Dr. Levitt on Counts IV (civil conspiracy); VI (intentional infliction of emotional distress); VII (contract—42 U.S.C. § 1981); and VIII (contract—duty of fair dealing and good faith). On May 5, 2005, the trial court granted summary judgment as to WHC and Dr. DiPasquale on counts IV (civil conspiracy); VI (intentional infliction of emotional distress); VII (contract—42 U.S.C. § 1981); and VIII (contract—duty of fair dealing and good faith). Mr. and Mrs. Hill appeal each of these orders.

On May 16, 2005, the matter went to trial by jury on Counts I (negligence), II

---

6. On April 14 1998, before the surgery, Mr. Hill told Dr. DiPasquale that he wanted to keep the screws after she removed them, and upon hearing that, appellant testified that the change in Dr. DiPasquale's demeanor was like "night and day." Mr. Hill described: "as soon as I asked for the screws, it was like I am not going ... to be part of your lawsuit ... I'm not going to be a witness for you," referring to his impression of Dr. DiPasquale's reaction.

7. Appellant testified that Dr. DiPasquale told him that he was a control freak and that their relationship was a long-term doctor-patient relationship for his care that was not working out. Appellant also testified that Dr. DiPasquale was in tears when she came to his hospital room and informed him that she had to "live with these people [referring to Dr. Levitt] and you're not worth it."

8. The Complaint included: Count I. Medical Malpractice (negligence)-WHC, Drs. Levitt and Danzinger; Count II. Medical Malprac-

tice (abandonment)-WHC, Drs. Levitt, and Danzinger; Count III. Medical Malpractice (lack of informed consent)-WHC, Drs. Levitt, Danzinger; Count IV. Medical Malpractice (civil conspiracy)—Drs. Levitt, Danziger, DiPasquale; Count V. negligent infliction of emotional distress-WHC, Drs. Levitt, Danzinger, DiPasquale; Count VI. intentional infliction of emotional distress-WHC, Drs. Levitt, Danzinger, DiPasquale; Count VII. contract 42 U.S.C. § 1981 WHC, Drs. Levitt, Danzinger, DiPasquale; Count VIII. contract—duty of fair dealing and good faith WHC, Drs. Levitt, Danzinger, DiPasquale; and Count IX. loss of consortium (Peggy Hill)WHC, Drs. Levitt, Danzinger, DiPasquale

9. Dr. Danzinger was originally named in appellants' lawsuit; however, Dr. Danzinger was dismissed during the summary judgment stage and his dismissal is not being appealed.

(abandonment), III (lack of informed consent), V (negligent infliction of emotional distress), and IX (loss of consortium). Appellant testified and also presented the testimony of his wife, Peggy Hill, his expert, Dr. Bryant Bloss, Dr. Barrington Barnes (appellant's primary care physician,) and Dr. Buck (Mr. Hill's radiologist). At the close of appellants' case, appellees made a Motion for Judgment as a Matter of Law, which the trial judge granted, on all of the remaining claims. This consolidated appeal followed.

## I. Analysis

### A. The trial court correctly granted appellees' Motion for Judgment as a Matter of Law.

■ Our review of the trial court's grant of a Motion for Judgment as a Matter of Law is *de novo*, and we view the evidence in the light most favorable to the opposing party. "A verdict may be directed only if it is clear that the plaintiff has not established a *prima facie* case." *Strickland v. Pinder*, 899 A.2d 770, 773 (D.C.2006); *Snyder v. George Wash. Univ.*, 890 A.2d 237, 244 (D.C.2006).

### 1. Appellants' expert failed to establish the basis for his national standard of care testimony.

■ Dr. Bloss failed to establish a basis for his knowledge of the national standard of care for the treatment of osteomyelitis. We do not agree, as appellants' contend, that Dr. Bloss's general knowledge in the field of orthopedic surgery, which was sufficient for him to satisfy the first threshold requirement for qualifying as an expert, was sufficient to satisfy the second threshold requirement of demonstrating that his opinion testimony was grounded in and based on a national standard of care. Standing alone, Dr. Bloss' testimony regarding his educational and professional background, was insufficient to establish a basis for his knowledge of a national standard of care, and merely amounts to the expert's personal opinion. *See Strickland, supra,* 899 A.2d at 774.

■ Appellants' counsel attempted to elicit testimony from Dr. Bloss that to treat Mr. Hill's infection, all of the "hardware" should have been removed during the second operation with Dr. Levitt. Further, counsel attempted to elicit testimony establishing that when Dr. Levitt left two screws in Mr. Hill's leg, his conduct did not comport with the national standard of care. However, appellee's counsel objected, based on lack of foundation, and the objections were sustained by the trial court.

**Ms. Holt (appellants' counsel):** Do you have experience in osteomyelitis? You have already told us you do, is that accurate?

**Dr. Bloss:** Yes.

Q. ....you also have experience in the treatment of osteomyelitis, you told us, right?

A. Yes.

Q. And as a result of your experience in the treatment of osteomyelitis, is there a reason why *you* as an orthopedic surgeon would want to remove the hardware of a person who has developed osteomyelitis?

**Mr. Montedonico (trial counsel for Dr. Levitt)** Objection; foundation.

**The court:** Sustained.

**Ms. Holt:** Court's indulgence for a moment.

Q. Have *you* had experience-have *you* had experience in removing the hardware after a person develops osteomyelitis?

A. Yes, many times.

Q. Could you give an estimate?

A. Hundreds.

. . . .

Q. And were these people who had open reduction and internal fixation

A. Some of them.

Q. In your experience, did *you* have a reason for removing the hardware after they developed?

**Mr. Montedonico** Objection again to the foundation, what *he* does.

. . .

**The court:** I will sustain as to the form.

**Ms. Holt:** Are you aware of practices of other physicians with respect to removal of the hardware after a person has osteomyelitis and he has had open reduction and internal fixation?

**Mr. Montedoncio:** Objection; lack of foundation.

**The court:** Sustained.

**Ms. Holt:** During *your* training doctor, did *you* study the subject of open reduction and internal fixation?

A. Yes.

Q. Did you study the risk involved in open reduction and internal fixation?

A. Yes.

Q. And, *you* had an opportunity-let me go in particular to where *you* were interning with Dr. Seligson, during that period of time did *you* work with people who had osteomyelitis?

A. Yes.

Q. And were those people who had osteomyelitis following trauma, and surgical repair?

A. Yes, most of them.

Q. Any, in any of those cases did *you* make recommendation for removal of the hardware?

A. Yes.

**Mr. Montedonico:** Objection

**The court:** Basis.

**Mr. Montedonico:** What *he* did with some unknown patient is not relevant to this case.

**The court:** Sustained.

. . .

Q. Let me ask it this way. Is it standard practice in the field of orthopedic surgery to remove hardware after a person has had open reduction and internal fixation and there appears to be an infection?

A. Yes.

**Mr. Montedonico:** Objection

**The court:** Basis.

**Mr. Montedonico:** Lack of foundation.

. . .

**Ms. Holt:** Can you tell us *some* name of *some* treatises that deal with the subject?

. . .

**Mr. Montedonico:** Objection. This is not permissible under direct examination.[10]

---

**10.** This objection was sustained, and appellants' challenge this ruling on appeal. The trial court properly sustained appellees' objection. Appellants' counsel failed to lay the necessary foundation for the testimony to be admissible under the learned treatise exception to the hearsay rule. *See Washington v. United States*, 884 A.2d 1080, 1095–96 (D.C. 2003) (applying Federal Rule of Evidence 803(18) and noting that it is consistent with District of Columbia law and practice). Federal Rule of Evidence 803(18) requires that in order for an expert to testify to a learned treatise, that treatise must be relied upon to form the expert's opinion. Appellants did not identify the specific portions of the treatises relied upon nor establish that they were authoritative. *See Washington, supra*, 884 A.2d at 1095. During the exchange under direct examination, Ms. Holt never asked Dr. Bloss if he had *relied* upon these treatises to form his opinion. She only asked him if he was familiar with the "general standards" and asked him to state the names of some treatises on the subject. As such, the proper founda-

. . .

**Ms. Holt:** I should not just ask you familiar standards. Is it necessary for you as an orthopedic surgeon operating on people who have osteomyelitis to know the standards for determining why hardware should be removed?

A. Yes.

Q. Okay. And what is the reason why an orthopedic surgeon would remove hardware after a person has had open reduction and internal fixation, followed by osteomyelitis.

**Mr. Montedonico:** Objection.

Bench Conference:

. . .

**Ms. Holt:** No, I'm not [understanding the objections]. I know that there was an objection to his qualification, but he was qualified as an orthopedic surgeon. He is now testifying to what orthopedic surgeons do.

**The court:** He can't just sort of give these generalities about what they do. We are talking about this case, his opinions in this case and what he reviewed, and what he looked at in this case and so on and so forth. Or he can say that he is familiar with the procedures. He has said that. Now you are just talking about what people do in the world, people remove screws, people remove hardware. . . . He is saying in a hundred cases some place somebody might remove some hardware where a person has osteomyelitis and reduction in internal fixation . . . *we need to talk about this case and his opinions in this case, his review of this case, and why he has reached certain opinions.*

**Ms. Holt:** When I get to assess more foundation to lay before him to show that he has a factual basis for giving an opinion in this case. [sic] That is all I am trying to show that he has a factual basis for it.

**The court:** When you get there, you will get to where you need to be.

The trial court correctly concluded that the appellant never "got there" and never established the basis for Dr. Bloss' knowledge of a national standard of care, what the national standard of care was, or the basis for his opinion that Mr. Hill's doctors deviated from the national standard. Instead, Dr. Bloss repeatedly stated *his personal views* and *his* practices and procedures. He failed to link his views to a national standard of care. The trial court concluded:

The motion is granted for the following reasons. Ms. Holt may recall that after sustaining several objections by the defense to certain testimony being offered by Dr. Bloss, the parties came to the bench. And Ms. Holt inquired of the Court words to the effect of, well, I don't know what I'm doing along here. I may not be putting it exactly right. And I said, well, Ms. Holt, well, I will tell you, I would be telling you what to do, which I don't think the defense wants me to

tion was not laid prior to counsel asking Dr. Bloss if he knew the name of any treatises on the subject. Therefore, the objection was properly sustained by the trial court. Even if the objection were sustained in error, appellants make no proffer as to what the excluded testimony would have been and if it would have established a standard of care. *See Caulfield v. Stark,* 893 A.2d 970, 981 (D.C. 2006) ("to properly preserve excluded testi-

mony for review on appeal, trial counsel must normally make an offer of proof") (quoting *District of Columbia v. Kora & Williams Corp.,* 743 A.2d 682, 690 (D.C.1999)). On cross-examination, counsel can ask an expert witness about a treatise or authoritative source without first establishing that the witness relied upon that source. *See, e.g., Washington, supra,* 884 A.2d at 1094 n. 14.

do. And I said that because I knew that if I said much more and I forced Mr. Montedonico [Dr. Levitt's counsel] to probably go a little bit further in stating the grounds of his objection, tha[n] he wanted to as well as Mr. Costello [Dr. DiPasquale and WHC's counsel]. Because if I said it, I would tell you what was missing. At least I felt that way. Maybe I was wrong. But [I] felt that danger.

The reason the objections were being sustained as to lack of foundation, in my view, *was because there had been no testimony as to the national standard of care.* And the questions were being phrased, Dr. Bloss, is it *your* opinion within a reasonable degree of medical certainty and the national standard of care, that W, X, Y and Z and there had been no testimony as to the national standard of care.

I have reviewed my notes and while there was testimony by Dr. Bloss concerning a number of things, he began by explaining cortex tibia, distal, close fracture, open fracture, commuted fracture, crush injury. He talked about *his familiarity* with the procedures of open reduction and external fixation. He talked about the use of anesthesia, local or general in those circumstances. He talks about—he talked about healing in that regards. He talked about external fixation. He talked about *his dealing* with the fractures of the tibia and fibula, and about the factors to use an external fixation. *But he never talked about a national standard of care in that regard, either his familiarity with it nor what it is.*

Dr. Bloss's testimony was fatally flawed in two respects: first, Dr. Bloss appeared to be giving his personal opinion based on his experience; and second, Dr. Bloss never referenced the basis for knowledge of a national standard of care, what the national standard was, or the basis of his opinion that Dr. Levitt's conduct fell below the standard of care.

 As we have previously held, an expert in a medical malpractice case must establish the basis for his knowledge of the applicable national standard of care and link his opinion testimony to the applicable national standard. In a medical malpractice case, the plaintiff must establish the applicable standard of care, a deviation from that standard and a causal relationship between the deviation and the injury. *See, e.g., Travers v. District of Columbia,* 672 A.2d 566, 568 (D.C.1996). Through expert testimony regarding the applicable national standard of care, the plaintiff must establish, "the course of action that a reasonably prudent doctor with the defendant's specialty would have taken under the same or similar circumstances." *Strickland, supra,* 899 A.2d at 773 (quoting *Meek v. Shepard,* 484 A.2d 579, 581 (D.C. 1984)). The personal opinion of the expert is insufficient, the expert must establish "that a particular course of treatment is followed *nationally* either through reference to a published standard, discussion of the described course of treatment with practitioners outside the District at seminars or conventions, or through presentation of relevant data." *Strickland, supra,* 899 A.2d at 773–74 (internal quotations and citations omitted) (emphasis added); *see also Snyder, supra,* 890 A.2d at 241 n. 3; *Hawes v. Chua,* 769 A.2d 797, 806 (D.C. 2001); *Travers, supra,* 672 A.2d at 568–69.

In *Snyder,* this court reversed a trial court's grant of a directed verdict holding that the physician's expert testimony was sufficient to establish a national standard of care and deviation from that standard. *Snyder, supra,* 890 A.2d at 239. In *Snyder,* the expert did not use the exact term 'national standard of care' but testified

that his knowledge of the standard of care was *based upon* attendance at national meetings and keeping up to date with literature with regard to the national standard. *Id.* at 245–46.

Likewise, in *Hawes,* we concluded that the expert's testimony was minimally sufficient for admission into evidence. *Hawes, supra,* 769 A.2d at 808. In *Hawes,* the court laid out seven principles that are important in assessing the sufficiency of national standard of care testimony, when an expert has already been qualified to give an expert opinion:

First, the standard of care focuses on the course of action that a reasonably prudent doctor with the defendant's specialty would have taken under the same or similar circumstances. Second, the course of action or treatment must be followed nationally. Third, the fact that District physicians follow a national standard of care is insufficient in and of itself to establish a national standard of care. Fourth, in demonstrating that a particular course of action or treatment is followed nationally, reference to a published standard is not required, but can be important. Fifth, discussion of the course of action or treatment with doctors outside this jurisdiction, at seminars or conventions, who agree with it; or reference to specific medical literature, may be sufficient. Sixth, an expert's personal opinion does not constitute a statement of the national standard of care; thus a statement only of what an expert would do under similar circumstances is inadequate. Seventh, national standard of care testimony may not be based upon mere speculation or conjecture.

*Hawes, supra,* 769 A.2d at 806 (internal citations and quotations omitted).

When the expert in *Hawes* was asked the basis for his opinion with respect to the national standard of care, he testified that his testimony was *based on* reading literature in his specialty, attendance at national meetings and the standard of the American College of Obstetrics and Gynecology, which provided an accepted national standard of care to physicians in his field. *Hawes, supra,* 769 A.2d at 807. Similarly, in *Washington v. Washington Hosp. Ctr.,* 579 A.2d 177, 182 (D.C.1990), we concluded that there was sufficient evidence to establish a national standard of care. The expert in *Washington* did state his personal opinion, but also testified that the *basis of* his conclusion, that carbon dioxide monitors were required in operating rooms, was founded on several national publications. *Id.*

This case is distinguishable from *Washington,* where we concluded that there was other evidence in the record, which in combination with the expert's testimony, established a standard of care. *Washington, supra,* 579 A.2d at 183. For instance, there was evidence that other teaching hospitals in the United States used the carbon dioxide monitors at issue; WHC's expert testified that the hospital he practiced at had the carbon dioxide monitor's and that many hospitals were converting to using carbon dioxide monitors. *Id.* Additionally, WHC's Chairman of Anesthesiology testified that the monitors were necessary to comport with the national standard of care. *Washington, supra,* 579 A.2d at 183. The record in this case lacks similar evidentiary support.

In contrast to *Washington* and *Hawes,* Dr. Bloss was never asked by counsel what was the basis of his knowledge of the national standard of care and what was the basis of his opinion that appellant's doctors deviated from the national standard. Nor did Dr. Bloss provide an independent basis that his opinion, regarding the removal of the hardware, was based upon literature,

speaking with other doctors around the country, attending medical conferences, or reviewing published national standards. Additionally, in contrast to *Washington,* there was no evidence admitted from which the national standard could have been inferred, although appellant's counsel did pose several questions to Dr. Bloss with respect to the national standard of care. For instance, here, appellants' counsel asked "when you testify here today are you here to testify to local standards or to national standards," and "are you aware of practices of other physicians with respect to removal of the hardware after a person has osteomyelitis and he has had open reduction and internal fixation." However, the objections to these questions were appropriately sustained because no proper foundation was established to demonstrate the *basis* of Dr. Bloss' knowledge of the national standard of care.

To the contrary, this case is more like our cases where we have concluded that the expert's testimony failed to establish the national standard of care. *See, e.g., Strickland, supra,* 899 A.2d at 770. In *Strickland,* we concluded that the expert's testimony had failed to establish a national standard of care and, we affirmed the trial court's grant of a Motion for Judgment. *Id.* In that case, appellant's expert was offered to establish that the appellees breached the national standard of care by failing to "perform additional tests when the decedent initially reported to the emergency room complaining of chest pains." *Id.* We reasoned that mere reference to an expert's educational and professional background was insufficient to establish a national standard of care. *Id.* at 774. We, therefore, held that the expert's

testimony amounted to nothing more than that expert's personal opinion.

Like the expert in *Strickland,* Dr. Bloss failed to establish the basis for his testimony and opinion regarding the national standard of care for the treatment of osteomyelitis. Although counsel for appellant asked "when you testify here today are you here to testify to local standards or to national standards,"[11] even if Dr. Bloss had responded in the affirmative, merely noting that the testimony was based upon a national standard was insufficient, unless he had first established the basis for his knowledge of the national standard. Further, Dr. Bloss was asked, "are you aware of practices of other physicians with respect to removal of the hardware." This question lacked a proper foundation because a basis was never established for his knowledge of the practices of other physicians on the removal of hardware. Mr. Hill's counsel also asked Dr. Bloss "is it standard practice in the field of orthopedic surgery to remove hardware after a person has had open reduction and internal fixation." The objection to this question was properly sustained because Dr. Bloss could not testify as to what the national standard was without the adequate foundation establishing the basis for his knowledge of a national standard. *See Strickland, supra,* 899 A.2d at 774 ("Dr. Stark made repeated references to a standard and claimed that it was applicable in this case ... [w]ithout any supplemental support, however, this testimony amounted to nothing more than the expert's opinion.").

Dr. Bloss's testimony is like the testimony in *Strickland,* where we stated,

> The only attempt that the expert made to reference a national standard was by

11. Appellee's objection to the question was sustained, without explanation by the trial judge.

stating in rather general terms that his opinion was "[w]hat other similarly trained doctors would have done under similar circumstances," or that it was the "standard of care what doctors do in hospitals around the country." Even after explicit direction from the trial judge, Dr. Stark made no attempt to link his testimony to any certification process, current literature, conference or discussion with other knowledgeable professionals, any of which would have established a basis for his discussion of the national standard of care.

*Strickland, supra,* 899 A.2d at 774.

It is counsel's duty to lay the necessary foundation to establish the national standard of care. It is not sufficient to rely on an expert's background or professional experience, nor is a simple statement that something does or does not comport with the national standard of care sufficient. The expert must explicitly indicate the *basis* for his or her knowledge of the national standard of care, state what the national standard of care is, and provide a basis for his or her opinion testimony that another doctor has deviated from that standard. That was not done here. As such, the trial court did not err in granting judgment to appellees on this issue.

**2. Appellants did not establish a *prima facie* case for abandonment.**

The trial judge properly granted the Motion for Judgment on Mr. Hill's abandonment claim, because he did not establish a *prima facie* case for abandonment. Mr. Hill argues that he was abandoned because Dr. DiPasquale withdrew before the surgery and left him to locate another surgeon. Prior to Mr. Hill's third surgery, Dr. DiPasquale informed him that she was canceling the surgery and provided him with the names of three doctors who could provide him with care. Mr. Hill eventually went home and, through his own internet research, located Dr. Tetsworth, who ultimately performed the surgery, which was scheduled by Dr. DiPasquale.

Abandonment is the "termination of the professional relationship between the physician and patient at an unreasonable time or without affording the patient the opportunity to procure an equally qualified replacement." *Miller v. Greater Se. Comm. Hosp.,* 508 A.2d 927, 929 (D.C.1986). Expert testimony is necessary on the issue of abandonment to establish that the severance was accomplished in line with appropriate standards. *See Tavakoli–Nouri v. Gunther,* 745 A.2d 939, 941 (D.C.2000) (affirming dismissal of abandonment claim for failure to retain an expert).

Here, there was insufficient expert testimony on the standard of care with respect to the issue of abandonment. Dr. Bloss testified that Dr. DiPasquale violated the national standard of care by discharging appellant from the hospital prior to surgery. Much like Dr. Bloss' testimony on negligence, appellees continuously objected based upon a lack of foundation, and the trial court sustained the objections. However, Dr. Bloss was eventually asked a question regarding the *basis* for his opinion that Dr. DiPasquale abandoned Mr. Hill. His response, however, was still inadequate to establish the proper foundation:

**Ms. Holt**

Q. Can you tell us upon what you base your opinion that Dr. DiPasquale violated the standard of case when she discharged Mr. Hill in the medical condition he was in without providing adequate care?

. . .

A. the basis is that [Dr. DiPasquale] had a plan, she didn't carry through

with the plan, she had informed consent from the patient for the plan, and then she decided to not finish it, and didn't give him adequate options to complete it, because he had a fracture. The fracture is non union and this was against the oath that every doctor takes.[12]

This testimony was still devoid of any linkage to his knowledge of a national standard of care which formed the basis for his conclusion that Mr. Hill was 'abandoned.'

 Even if Dr. Bloss' testimony on Dr. DiPasquale's deviation from the standard of care was "minimally sufficient," the facts here do not support a *prima facie* case of abandonment. Dr. DiPasquale did not completely sever the relationship with Mr. Hill when she cancelled his surgery. She provided him with the names of three doctors who could provide care for him, and she also provided him with a prescription for Vancomycin, which was used in the treatment of his infection. "Where a patient is not in need of *immediate* medical attention, supplying the patient with a list of substitute physicians to replace the attending physician is a reasonable means of severing the professional relationship." *Miller, supra,* 508 A.2d at 929 (emphasis added). Further Mr. Hill does not argue that his condition was in any way worsened by not having the operation performed by Dr. DiPasquale that day. Although his condition was serious, he was not in need of *immediate* attention. We have noted that the "abandonment must be at a critical stage of the illness or treatment." *Woodfolk v. Group Health Ass'n,* 644 A.2d 1367, 1368 (D.C. 1994); *see, e.g., Haidak v. Corso,* 841 A.2d 316 (D.C.2004) (finding no abandonment where after surgery the patient was treated by a team of medical personnel at the hospital); *Ascher v. Gutierrez,* 175 U.S.App. D.C. 100, 533 F.2d 1235 (1976) (finding abandonment where the anesthesiologist left the operating room and was not replaced). As such, the trial court properly granted judgment on this count of the complaint.

### 3. Mr. Hill rendered his informed consent.

 Mr. Hill also argues that the trial judge erred in granting the Motion for Judgment on his informed consent claim. He contends he was not given sufficient information to choose an internal fixation versus external fixation procedure because he was not informed that there was a *greater* risk of infection [13] with an internal fixation.[14]

[T]o recover on a claim of lack of informed consent, a plaintiff must prove

---

12. The trial court sustained the defense's objection with respect to the "oath that every doctor takes" portion of the testimony.

13. In *Canterbury v. Spence,* 150 U.S.App. D.C. 263, 279, 464 F.2d 772, 788 (1972), the court stated that "[s]ome dangers—infection, for example—[sic] are inherent in any operation; there is no obligation to communicate those of which persons of average sophistication are aware."

14. Appellant alleges two additional areas where Dr. Levitt did not obtain his informed consent. Appellant argues that Dr. Levitt failed to inform him of a risk of infection

when his leg began to turn dark at the surgical site. He also asserts that Dr. Levitt failed to inform him that two screws remained in his leg after the February 11, 1998 operation to remove the hardware. Notwithstanding appellant's arguments to the contrary, these arguments sound in negligence. Informed consent is concerned with the "duty of a physician to inform the patient of the consequences of a *proposed treatment,* a duty that stems from the right of every competent adult human being to determine what shall be done with his own body." *Miller–McGee, supra,* 920 A.2d at 439 (quoting *Crain v. Allison,* 443 A.2d 558, 561 (D.C.1982)).

that there was an undisclosed risk that was material; that the risk materialized, injuring plaintiff; and that plaintiff would not have consented to the procedure if she had been informed of the risk. A material risk is a risk which a reasonable person would consider significant in deciding whether to undergo a particular medical treatment.

*Miller–McGee v. Washington Hosp. Ctr.*, 920 A.2d 430, 440 (D.C.2007) (quoting *Abbey v. Jackson*, 483 A.2d 330, 332 (D.C. 1984)).

■■■ We have stated that "at a minimum, a physician must disclose the nature of the condition, the nature of the proposed treatment, any alternate treatment procedures, and the nature and degree of risks and benefits inherent in undergoing and in abstaining from the proposed treatment." *Crain, supra* note 14, 443 A.2d at 562 (noting that a physician need not advise a patient concerning risks of which a patient already has actual knowledge). "Expert testimony is required to establish the nature of the risks inherent in a particular treatment, the probabilities of therapeutic success, the frequency of the occurrence of particular risks, the nature of available alternatives to treatment and whether or not disclosure [of particular risks] would be detrimental to a patient." *Miller–McGee, supra*, 920 A.2d at 440.

Dr. Bloss offered the following testimony on the issue of informed consent:

**Ms. Holt**

Q: Can you tell us based upon a national standard of care what information an orthopedic surgeon would provide to Mr. Hill. Strike that for a minute. Have *you*

been in a situation where *you* as an orthopedic surgeon do this?

A: Yes; I was on the board of the Counsel of American Academy of Orthopedic surgeons where we reviewed all these things, a member of audit committees, and gone to hospitals and audited them.

Q: And based upon that experience are you able to tell us what was insufficient about the information Dr. Levitt provided to Mr. Hill on [July 22, 1997] about the repair of his distal tibia and fibula fracture?

**Defense Counsel:** Objection.
**The court:** Sustained.

This testimony was insufficient to establish the national standard of care with respect to informed consent on this issue because Dr. Bloss' opinion was based on his personal experience, and did not provide a basis for a *national* standard of care.

■■■ However, expert testimony is not necessary on all elements of a claim for lack of informed consent. For instance, expert testimony is not necessary "to establish the scope of or the breach of the duty to inform one's patients before treating them." *Crain, supra* note 14, 443 A.2d at 563. Therefore, whether Dr. Levitt informed Mr. Hill of the greater risk of the procedure elected, is a question for the jury and is "essentially a question of credibility, and not of science." *Tavakoli–Nouri, supra*, 745 A.2d at 942. The trial court correctly concluded that there was no issue for the jury because Mr. Hill signed a consent form which indicated that the risks associated with the initial surgery performed by Dr. Levitt were explained to him.[15] Mr. Hill modified the consent form

---

**15.** The consent form, dated July 22, 1997 provided, in relevant part, "I have explained to the patient ... the nature of his/her condition, the nature of the operation or procedure to be done, the nature and the degree of risks and benefits associated with undergoing and in abstaining from the operation or procedure, *alternatives to the operation or procedure*

slightly and requested that his anesthesiologists be board certified. Appellant's signature and hand-written modification to the form are strong evidence that Mr. Hill rendered his informed consent. *See, e.g., Graff v. Malawer,* 592 A.2d 1038, 1041 (D.C.1991) (finding Judgment as a Matter of Law appropriate "because the testimonial and documentary evidence in the record, particularly the consent form that bore what he admitted was his signature, is so overwhelmingly contrary to [appellant's] position [that he lacked informed consent.]").[16] The trial court did not err in granting judgment on this issue.

### 4. Appellants failed to establish a *prima facie* case of intentional infliction of emotional distress.

■■■■ The trial court also granted judgment on Mr. Hill's negligent infliction of emotional distress claim and Ms. Hill's loss of consortium cause of action. To establish a *prima facie* case of negligent infliction of emotional distress, the plaintiff must prove that he was in the zone of danger created by the defendant's negligence and that the distress is serious and verifiable. *Sowell v. Hyatt Corp.,* 623 A.2d 1221, 1224 (D.C.1993); *Williams v. Baker* 572 A.2d 1062, 1064 (D.C.1990) (en banc); *Brown v. Argenbright Sec., Inc.,* 782 A.2d 752, 759 n. 9 (D.C.2001) (concluding that appellee was not liable for negligent inflic-

tion of emotional distress as a result of security guard's alleged sexual touching of minor whom he had stopped on suspicion of shoplifting because there was no evidence that the minor ever feared for her physical safety and the conduct alleged by minor was *not negligence* but an intentional tort). Because we conclude that appellants failed to establish a *prima facie* case for negligence, it was proper to grant judgment as a matter of law on this cause of action.

### 5. Appellants failed to establish a *prima facie* case of loss of consortium.

■■■■ A loss of consortium claim depends on whether the underlying claim of negligence against the defendant has been proven. *Massengale v. Pitts,* 737 A.2d 1029, 1033 (D.C.1999); *see also Casper v. Barber & Ross Co.,* 109 U.S.App. D.C. 395, 397 n. 1, 288 F.2d 379, 380 n. 1 (1961) (spouse's damage claim for loss of consortium is *dependent on plaintiff establishing that defendant was negligent*). Because appellants' failed to establish a *prima facie* case of negligence, judgment was properly granted on this issue.[17]

Appellants failed to establish a *prima facie* for any of the causes of action advanced at trial. As such, the motion for judgment as a matter of law was properly granted.

---

*to be performed, and the nature and degree of risks and benefits associated with each of those alternatives."* (Emphasis added)

**16.** The record reveals that Mr. Hill was aware from a previous surgery, of the risks involved with an internal fixation and of the possible alternatives. While this information did not relieve Dr. Levitt of the duty to inform Mr. Hill of known risks related to his treatment in this case, it is probative of the fact that Mr. Hill already had actual knowledge about internal and external fixation procedures. "A physician need not advise concerning risks of which the patient already has actual knowl-

edge." *Crain, supra* note 14, 443 A.2d at 562; *see also Canterbury,* 464 F.2d at 788 ("the physician bears no responsibility for discussion of hazards the patient had already discovered.").

**17.** Additionally, because we conclude that Mr. Hill failed to establish Dr. Levitt's negligence, we need not reach whether WHC was liable for Dr. Levitt's acts, as an independently contracted physician, based on a theory of ostensible agency pursuant to *Street v. Washington Hosp. Ctr.,* 558 A.2d 690 (D.C.1989).

## B. The trial court did not err in granting appellees' motions for partial summary judgment.

 The trial court properly granted summary judgment on appellants' claims for 42 U.S.C. § 1981 breach of contract (racial discrimination), breach of good faith and fair dealing, civil conspiracy, intentional infliction of emotional distress, and punitive damages. Mr. Hill was unable, when asked by the trial court, to point to specific deposition testimony or other evidence to support these claims. Nor was he able to proffer to the trial court any evidence beyond his own feelings and perceptions to support these claims. Partial summary judgment was warranted because Mr. Hill proffered *no* facts upon which a reasonable juror could find in his favor on any of the causes of action. The question of whether summary judgment was properly granted by the trial court is a question of law reviewed *de novo*. *Abdullah v. Roach,* 668 A.2d 801, 804 (D.C. 1995). We review the record independently in the light most favorable to the non-moving party to determine whether any material factual issues exist. *Id.*

Mr. Hill contends that the trial court erred in granting summary judgment on his racial discrimination claim because there were disputed material facts about whether his doctors were motivated by racial discrimination in their treatment of him. Mr. Hill is African–American and the doctors he accused of racial discrimination are Caucasian.[18] In a deposition, Mr. Hill stated, "I know from peoples' inflection in their voices, treating me differently than somebody else ... that's how it felt to me." Also, in an affidavit, Dr. Bloss, upon examination of Mr. Hill's medical records, "found a pervasive pattern of medical malpractice that cannot be accounted for by simple medical negligence or error alone. It is upon this pervasive pattern that I reached the conclusion that there was significant evidence of racial bias in the treatment of Vincent Hill." [19] Despite a request from the trial court, no additional testimony or evidence was offered in support of this claim.

 In order to establish his discrimination claim pursuant to 42 U.S.C. § 1981,[20] Mr. Hill was required to prove (1) membership in a racial minority group, (2) intent by the defendant to discriminate on the basis of race, and (3) discrimination that concerned one or more of the activities enumerated in the statute. *Munday v. Waste Mgmt. of N. Am.,* 126 F.3d 239, 242 (4th Cir.1997).

**18.** Appellants' did not assert a racial discrimination claim against Dr. DiPasquale.

**19.** Specifically, Dr. Bloss pointed to delays in proper diagnostic procedures, failure to have proper x-rays to help localize hardware and confirm adequate removal of hardware, failure to take appropriate cultures, unprofessional communications and discussions with Mr. Hill, and the failure to remove two screws during the second operation.

**20.** Equal Rights Under The Law 42 U.S.C. § 1981, provides:
(a) Statement of equal rights
All persons within the jurisdiction of the United States *shall have the same right* in every State and Territory *to make and enforce contracts,* to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.
(b) Make and enforce contracts defined
For purposes of this section, the term make and enforce contracts includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

■ In their opposition to appellees' motion for summary judgment, appellants argue that based on Dr. Bloss's affidavit and deposition testimony that Mr. Hill was treated in a discriminatory manner, a jury could find for appellants on this issue. In the complaint, appellants alleged that Mr. Hill was treated in a highly unprofessional manner and his treatment was substantially beneath the standards used in providing medical services to white citizens. Appellant cannot merely invoke his race in the course of his narrative and automatically be entitled to pursue relief under § 1981, rather he "must allege some facts that demonstrate that his race was the reason" for defendants' actions. *Jaffe v. Fed. Reserve Bank of Chicago*, 586 F.Supp. 106, 109 (D.Ill.1984). Appellant failed to provide such facts. In *Christian v. Wal–Mart Stores, Inc.*, 252 F.3d 862 (6th Cir.2001), the Sixth Circuit applied the following standard to a § 1981 discrimination claim in a commercial setting:

(1) plaintiff is a member of a protected class;

(2) plaintiff sought to make or enforce a contract for services ordinarily provided by the defendant; and

(3) plaintiff was denied the right to enter into or enjoy the benefits or privileges of the contractual relationship in that (a) plaintiff was deprived of services while similarly situated persons outside the protected class were not and/or (b) plaintiff received services in a markedly hostile manner and in a manner which a reasonable person would find objectively discriminatory.

*Christian, supra*, 252 F.3d at 872 (holding that the trial court erred in granting judgment as a matter of law because appellants had advanced sufficient evidence of race discrimination so that the issue of whether the shoppers were removed from the store due to race discrimination was a question for the jury).

Mr. Hill relies on § 3(b) of the factors set forth by the Sixth Circuit in *Christian*, in support of his claim and urges this court to afford him § 1981 relief in the context of his alleged commercial discrimination. *Christian, supra*, 252 F.3d at 872. This jurisdiction has not addressed the issue. Even if this court were to adopt the Sixth Circuit's standard in *Christian* for Mr. Hill's claim, the conclusory statements in the complaint and in the record failed to establish that Mr. Hill received medical services in a markedly hostile manner. The trial court properly granted summary judgment because, even viewing the record in the light most favorable to appellants, a reasonable person could not objectively find that the doctors provided services in a markedly hostile and, therefore, discriminatory manner in violation of 42 U.S.C. § 1981.

■ Appellants argue that the trial court erred in granting summary judgment on their claim that appellees breached their duty of good faith and fair dealing. The record viewed in the light most favorable to appellants is devoid of factual support for this claim. Mr. Hill offers no evidence to support his contention that the appellees acted in bad faith. More importantly, appellant offers no authority for the application of this principle to a medical malpractice action. "In every contract there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract, which means that in every contract there exists an implied covenant of good faith and fair dealing." *Hais v. Smith*, 547 A.2d 986, 987 (D.C.1988) (citation omitted). "If a party to the contract evades the spirit of the contract, willfully renders imperfect performance, or inter-

feres with performance by the other party, he or she may be liable for breach of the implied covenant of good faith and fair dealing." *Paul v. Howard Univ.*, 754 A.2d 297, 310 (D.C.2000); *see also, Hais, supra*, 547 A.2d at 987–88. His complaint simply states that the appellees entered into a contract, willfully evaded the contract to perform medical services and rendered poor performance in the delivery of medical services. At the summary judgment stage, however, appellants did not provide additional facts to support this allegation.

 Mr. Hill further argues that the trial court erred in granting summary judgment because Dr. Levitt and Dr. DiPasquale engaged in a civil conspiracy to abandon him prior to the surgery Dr. DiPasquale was to perform. To establish a *prima facie* case of civil conspiracy, Mr. Hill needed to prove: (1) an agreement between two or more persons (2) to participate in an unlawful act, and (3) injury caused by an unlawful overt act performed by one of parties to the agreement, and in furtherance of the common scheme. *Paul, supra*, 754 A.2d at 310. Civil conspiracy "is not an independent tort but only a means for establishing vicarious liability for an underlying tort." *Id.* at 310 n. 27. Mr. Hill argues that the underlying unlawful act by Dr. Levitt and Dr. DiPasquale was abandonment of him prior to surgery. The trial court's order granting partial summary judgment reasoned that the underlying tort was racial discrimination, and, because Mr. Hill could not establish a genuine issue of material fact that he was intentionally discriminated against, it had to grant partial summary judgment. Whether the underlying act was racial discrimination or abandonment, the trial court did not err in granting partial summary judgment. The record does not reveal *any* facts, with the exception of appellants own conclusions, that the doctors participated in a civil conspiracy. "Conclusory allegations by the non-moving party are insufficient to establish a genuine issue of material fact or to defeat the entry of summary judgment." *Futrell v. Dep't of Labor Fed. Credit Union*, 816 A.2d 793, 803 (D.C.2003) (internal citations and quotations omitted).

 Appellants also argue that the trial court erred in granting summary judgment because Mr. Hill suffered emotional distress due to the intentional acts of the doctors. To establish a *prima facie* case for intentional infliction of emotional distress, he was required to show "(1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) cause[d] [Mr. Hill] severe emotional distress." *Howard Univ. v. Best*, 484 A.2d 958, 985 (D.C.1984) (citation omitted). "The requirement of outrageousness is not an easy one to meet." *Drejza v. Vaccaro*, 650 A.2d 1308, 1312 (D.C.1994). The conduct "must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." *Futrell, supra*, 816 A.2d at 808 (internal citations and quotations omitted). Appellant argues that the extreme and outrageous conduct was "throwing" him out of the hospital and canceling his surgery. However, because this conduct was insufficient to establish appellant's abandonment cause of action, it cannot rise to the level of outrageous conduct necessary to sustain an intentional infliction of emotional distress cause of action.

 Finally, we also disagree with appellants' contention that the trial court granted partial summary judgment on appellants' punitive damages cause of action erroneously. "Punitive damages are warranted only when the defendant commits a tortious act accompanied with fraud, ill will, recklessness, wantonness, oppressiveness, willful disregard of the plaintiff's rights, or other circumstances tending to aggravate the injury." *Caulfield, supra* note 10, 893 A.2d at 979–80. The trial

court found no evidence in the record supporting punitive damages, and our affirmance of the other issues moots this damage issue.[21]

### III. Conclusion

Judgment as a Matter of Law was granted at the conclusion of appellants' case in chief because appellants' expert failed to establish a proper foundational basis for his opinion testimony regarding the national standard of care—an essential element to establish a *prima facie* medical negligence case. Similarly, prior to trial, the trial court properly granted partial Summary Judgment on appellant's breach of contract (racial discrimination), breach of contract (duty of fair dealing and good faith), civil conspiracy, intentional infliction of emotional distress, and punitive damages causes of action.

For the foregoing reasons, the judgment of the trial court is,

*Affirmed.*

---

21. Appellants' final argument is that throughout the proceedings, the trial judge did not treat the litigants equally. Appellants rely on Standardized Civil Jury Instruction, No. J–12 which provides:

> Our system of justice requires that you decide the facts of this case in an impartial manner. You must not be influenced by bias, sympathy, prejudice or public opinion. It is a violation of your sworn duty to base your verdict upon anything other than the evidence in the case. In reaching a just verdict, you must consider and decide this case as an action between persons of equal standing in the community and of equal worth.

> All persons stand equal before the law and must be treated as equals in this court.

Appellants offer no support for this contention that they were treated unfairly, and we find that this argument lacks merit.

In their brief, appellants argue that "the evidentiary errors of the court are too pervasive to address each in plaintiffs allotted pages." Appellant fails to discuss what those additional evidentiary errors by the trial court are. This court has stated that "trial court rulings come with a presumption of correctness and that it is the responsibility of the appellant to furnish an appellate record evidencing the claimed trial court error ... a party challenging any trial court decision bears the burden of presenting this court with a record sufficient to show affirmatively that error occurred." *Mbakpuo v. Ekeanyanwu,* 738 A.2d 776, 780–81 (D.C.1999) (internal quotations and citations omitted). "Failure to do so precludes appellate review of the alleged error." *Id.* at 780.